Justice Ingrid Gustafson delivered the Opinion of the Court.
***297 ¶1 Birth mother T.E. (Mother) appeals the Findings of Fact, ***298 Conclusions of Law and Orders Terminating Parental Rights, Re: Birth Mother issued by the Second Judicial District Court, Butte-Silver Bow County, on June 12, 2017. We reverse and remand for further proceedings consistent with this Opinion.
¶2 We restate the issues on appeal as follows:
1. Whether the District Court erroneously proceeded with termination of parental rights in the absence of a conclusive tribal determination regarding each child's status as an Indian child as defined by ICWA.
2. If ICWA does not apply, whether the District Court abused its discretion in terminating Mother's parental rights.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 This appeal concerns two siblings, D.E. (born in 2003) and A.E. (born in 2006). Although a separate cause number was assigned for each child's case, proceedings occurred simultaneously in the District Court with shared factual information and procedural histories. We consolidated these cases for purposes of appeal.
*589 ¶4 Mother is the only surviving birth parent as D.E.'s and A.E.'s birth father died violently in June 2015. Shortly after the birth father's death, law enforcement received reports expressing concern that Mother was unable to provide for the children's needs, but no intervention occurred at that time. In August 2015, law enforcement and the Department responded to a complaint that Mother had chased the children out of the home, threatened to kill A.E., and hit D.E. with a bungee cord. Mother was arrested for partner/family member assault; the children were placed with a non-relative kinship provider.
¶5 On September 2, 2015, the Department of Public Health and Human Services, Child and Family Services Division (the Department) filed petitions for emergency protective services, adjudication as youths in need of care (YINC) and temporary legal custody (TLC) for D.E. and A.E. The affidavits supporting the initial petitions indicated each child was potentially an Indian child subject to the Indian Child Welfare Act (ICWA). In his supportive affidavits, Child Protection Specialist Matt Lebrun (CPS Lebrun) alleged the children may be Indian children based on a birth parent being an enrolled member of the Blackfeet Tribe.[1] CPS Lebrun indicated he would send requests for verification of Indian child status to the Tribe and that he had contacted Blackfeet ***299 Tribal Social Services for assistance in finding placement options for the children.
¶6 On September 4, 2015, without any supporting documentation or affidavit from an ICWA expert or anyone with authority from the Blackfeet Tribe, the Department filed a Notice of No ICWA Involvement.
¶7 Mother attempted to see D.E. and A.E. in violation of a no-contact order after she was released from jail. She was re-arrested. Because Mother was suicidal and a potential risk to herself and others, she was committed to the Montana State Hospital (MSH) for a month. After Mother was released from MSH and following a contested hearing, the children were adjudicated as YINC on October 28, 2015. The District Court granted the Department TLC for a period not to exceed six months under non-ICWA standards in order for Mother to address housing, chemical dependency, and mental health issues.
¶8 At best, the evidence the Department presented at this hearing regarding the children's ICWA status was confusing. CPS Lebrun testified that the birth father was a member of the Blackfeet Tribe, but Lebrun had contacted the Blackfeet Tribe and was orally informed the children "are not eligible [for enrollment], just they can only be descendent members." CPS Lebrun informed the District Court that ICWA thus did not apply to D.E. and A.E., but acknowledged he had not received anything in writing from the Blackfeet Tribe. There was also confusion as to Mother's exact tribal affiliation, with CPS Lebrun testifying that Mother had a "tribal affiliation," but that she had informed CPS Lebrun that she was not enrollable and thus her children would also not be enrollable. CPS Lebrun admitted he had not contacted the tribe or tribes with which Mother claimed an affiliation. The District Court ordered the Department to develop an appropriate treatment plan for Mother and set hearing for December 7, 2015.
¶9 At hearing on December 7, 2015, CPS Supervisor Kara Richardson (Richardson) testified contact with Mother was inconsistent, and since the Department did not have a current address for her in Great Falls, it could not set up a courtesy worker there. Based on Richardson's testimony and other evidence, the District Court approved a treatment plan for Mother which included completing a parenting and chemical dependency evaluation, signing a release of information so the Department could obtain the psychological evaluation from MSH, obtaining safe housing, maintaining contact with the Department, and addressing legal/criminal matters.
¶10 Mother was out of contact with CPS Lebrun until early February 2016. She then began to work with the Department. In May 2016, the ***300 Department petitioned to extend TLC and moved to approve a second treatment *590 plan. Mother was not present at the May 18, 2016 hearing, but was represented by counsel. At that time, the Department indicated Mother was doing well: she had provided 17 negative UAs, was attending weekly counseling, and maintained adequate contact with the Department. The second treatment plan again focused on Mother addressing her mental health and chemical dependency issues and also required her to obtain and maintain safe housing and demonstrate the ability to parent. By then, Mother had secured her own residence and was attending individual counseling. The plan was for the children to be placed with a foster family closer to Great Falls after completion of the school year to increase contact with Mother and facilitate eventual reunification.
¶11 Again, CPS Lebrun testified this was a non-ICWA case, although the Department offered no evidence or documentation from any Indian tribe. The District Court granted a six-month extension of TLC and approved the second requested treatment plan.
¶12 On July 26, 2016, the children were placed in Mother's care for a trial home visit.
¶13 On August 9, 2016, the Department filed a letter from the Turtle Mountain Band of Chippewa Indians (the Indian Tribe of Mother's potential affiliation) conclusively stating the children were not enrolled or eligible for enrollment in that tribe. No documentation from any other tribe, including the Blackfeet Tribe, was ever filed in the District Court.
¶14 On October 11, 2016, the children were removed from Mother's care due to Mother's relapse on methamphetamine with positive UA testing. Mother tested positive for methamphetamine again in October and November 2016, soon after which she stopped attending her mental health counseling and discontinued her participation with UA testing.
¶15 On December 20, 2016, the Department again petitioned for extension of TLC and sought approval of a permanency plan of reunification or alternatively, termination of Mother's parental rights and adoption. At hearing on January 11, 2017, Mother stipulated to extension of TLC and agreed with the permanency plan of reunification. The District Court accepted Mother's stipulation and extended TLC for a period not to exceed six months. The District Court indicated the Department had made "active efforts" to return the children to Mother, whereupon the Department's counsel interjected that he wished to "correct the record" because ICWA did not apply to ***301 these cases.[2] The Department's counsel represented to the District Court that the court had already determined ICWA did not apply here. However, no documentation from the Blackfeet Tribe (the Indian Tribe of the birth father's affiliation) had been filed in the District Court.
¶16 On May 9, 2017, the Department filed a Petition for Permanent Legal Custody, Termination of Parental Rights with Right to Consent to Adoption and Request for Hearing Re: Birth Mother in which it alleged that the children were YINC, Mother had failed to successfully complete her treatment plans, and the conduct or condition rendering Mother unfit or unable to parent was not likely to change within a reasonable period of time. Again, despite the lack of any prior documentation, affidavit, or testimony of any individual with tribal authority of the Blackfeet Tribe being filed or provided at prior proceedings, the Department asserted ICWA did not apply.
¶17 Hearing was held June 7, 2017. CPS Christa Waliezer, the courtesy caseworker in Great Falls who worked with Mother to assist and monitor her progress on the goals and tasks of her treatment plans, testified Mother had weekly contact with her for three or four months beginning in March 2016, but her contact became progressively more infrequent after that point. Waliezer *591 testified Mother struggled with substance use. After positive UA tests in October and November 2016, Mother stopped participating in UA testing except for one test in February and one in March 2017, which were each negative. Waliezer further testified Mother missed mental health counseling appointments and was discharged from this service due to her failure to attend. She testified Mother did not believe she needed therapy, despite the therapist's opinion to the contrary. Finally, she testified that Mother's visits with the children had become problematic: D.E. had refused to attend visits after a confrontation in which Mother tried to make him feel guilty for not wanting to come home, and Mother attempted to manipulate A.E. by telling her Department workers were lying to her and by making impossible promises. Waliezer opined Mother had failed her treatment plans.
¶18 The Guardian ad litem (GAL) also supported termination of Mother's parental rights, opining such was in the best interests of the ***302 children, who needed a safe, stable home. She related that although D.E. wanted to be with his mother, he was afraid things would deteriorate again and he would be placed back in foster care. The GAL related that A.E. was sad about her mother's situation, but it was "OK" with her to terminate Mother's parental rights.
¶19 Mother testified on her own behalf, asserting when the children's birth father died, she "had a nervous breakdown," but was now recovered. She further testified that the children's father had been the disciplinarian and she had difficulty controlling the children after his death. She acknowledged she had only provided two UAs since November 9, 2016, but both were clean and she did not believe she needed additional chemical dependency treatment. She also testified she discontinued mental health services as she did not believe she needed any additional mental health treatment.
¶20 The District Court found Mother failed to successfully complete several components of her treatment plans including the chemical dependency and mental health related items, and that the conduct or condition rendering Mother unfit or unable to parent was not likely to change in a reasonable time. The District Court further found the Department made reasonable efforts to provide services in this case. Finally, the District Court found that termination of Mother's parental rights was in the children's best interests. Thus, the District Court terminated Mother's parental rights to the children and granted the relief requested by the Department.
STANDARD OF REVIEW
¶21 We review a district court decision to terminate parental rights for an abuse of discretion under the applicable standards of Title 41, chapter 3, MCA, and ICWA, Title 25, chapter 21, U.S.C. In re L.D. , 2018 MT 60, ¶ 10, 391 Mont. 33, 414 P.3d 768 (citing In re D.B. , 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691 ). In this context, a court abuses its discretion if it terminates parental rights based on clearly erroneous findings of fact, erroneous conclusions of law, or otherwise "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." In re D.B. , ¶ 18 (citation omitted); In re A.G ., 2005 MT 81, ¶ 12, 326 Mont. 403, 109 P.3d 756. Findings of fact are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or this Court has a definite and firm conviction that the lower court was mistaken. In re D.H. , 2001 MT 200, ¶ 14, 306 Mont. 278, 33 P.3d 616. We review conclusions of law de novo for correctness. In re M.W. , 2004 MT 301, ¶ 16, 323 Mont. 433, 102 P.3d 6 ***303 (citation omitted).
DISCUSSION
¶22 1. Whether the District Court erroneously proceeded with termination of parental rights in the absence of a conclusive tribal determination regarding each child's status as an Indian child as defined by ICWA.
¶23 Congress enacted ICWA in 1978 "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families...." 25 U.S.C. § 1902. At the core of ICWA is "the fundamental assumption that it is in the Indian *592 child's best interest that its relationship to the tribe be protected." Miss. Band of Choctaw Indians v. Holyfield et al. , 490 U.S. 30, 50 n. 24, 109 S.Ct. 1597, 1609, 104 L.Ed.2d 29 (1989) (quoting In re Appeal in Pima Cnty. Juvenile Action No. S-903 , 130 Ariz. 202, 635 P.2d 187, 189 (Ariz. App. 1981) ); see also 25 U.S.C. § 1901(5) (congressional finding that the States "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families"). ICWA imposes heightened federal standards for the removal of Indian children from their families. See, e.g. , 25 U.S.C. §§ 1902, 1911, and 1912(d) - (f) (congressional policy, tribal jurisdiction, and requirements for active remedial efforts, qualified expert testimony, and proof beyond a reasonable doubt). ICWA governs state court "child custody proceedings," as defined by 25 U.S.C. § 1903(1), involving an "Indian child," as defined by 25 U.S.C. § 1903(3) - (8). 25 U.S.C. § 1912. Proceedings under Title 41, chapter 3, MCA, are "child custody proceedings" as defined by ICWA. In re L.D. , ¶ 12.
¶24 All parents have fundamental constitutional rights over the custody and care of their children "which must be protected by fundamentally fair procedures" as a matter of federal and state constitutional due process. In re J.V. , 2003 MT 68, ¶ 7, 314 Mont. 487, 67 P.3d 242 (quoting In re M.A.E. , 1999 MT 341, ¶ 18, 297 Mont. 434, 991 P.2d 972 ). Consequently, we require district courts to make specific findings of fact in compliance with all pertinent statutory requirements before terminating parental rights. In re D.B. , ¶¶ 17-18 ; In re J.V. , ¶ 7. Because ICWA and § 41-3-609, MCA (termination of parental rights based on abuse, neglect, or abandonment), impose different standards for termination of parental rights depending on whether a child is an "Indian child," district courts must first verify the Indian or non-Indian status of a child prior to proceeding with termination proceedings whenever the court has reason to believe that the child is an Indian ***304 child as defined by ICWA. See 25 U.S.C. § 1912(a) (state agency has duty to notify the parent/Indian custodian and "Indian child's tribe" of state court child custody proceeding if "court knows or has reason to know that an Indian child is involved"); see also In re A.G. , ¶¶ 14-15 (citing Guidelines for State Courts; Indian Child Custody Proceedings B.1(a) , 44 Fed. Reg. 67586 (1979) ); accord Guidelines for State Courts and Agencies in Indian Child Custody Proceedings [hereinafter "2015 Guidelines "] A.3(c), A.4, B.2(a), B.2(b), B.3(d), and B.4(c), 80 Fed. Reg. 10146, 10150-53 (2015).[3]
¶25 ICWA defines an "Indian child" as (1) any unmarried person under age eighteen and (2) who either is "a member of an Indian tribe" or is "eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). ICWA also defines the related terms "Indian" and "Indian child's tribe." 25 U.S.C. § 1903(3) and (5). While the question of whether a child is eligible for tribal membership is a question of fact dependent on the child's actual ancestry, In re A.G. , ¶ 13 (citing In re the Adoption of a Child of Indian Heritage , 111 N.J. 155, 543 A.2d 925, 933 (1988) ), it is not a question of fact for de novo determination by district courts. Except as otherwise limited by federal statute or treaty, Indian tribes have the sole power to determine their membership and membership eligibility. In re A.G. , ¶ 13 (citing Adams v. Morton , 581 F.2d 1314, 1320 (9th Cir. 1978) ). An Indian tribe's determination of its membership or membership eligibility *593 is conclusive as a matter of law. In re Adoption of Riffle , 273 Mont. 237, 242, 902 P.2d 542, 545 (1995). Thus, the threshold questions of fact for district courts are (1) whether the court has reason to believe that a subject child may be an "Indian child" and (2) whether an Indian tribe has conclusively determined the child is a member or eligible for tribal membership. See In re A.G. , ¶¶ 14-17 ; ***305 In re Riffle , 273 Mont. at 242, 902 P.2d at 545 ; 2015 Guidelines B.2(b), B.3(d), and B.4(c), 80 Fed. Reg. at 10152-53 (2015).[4] Absent a conclusive tribal determination of membership or membership eligibility, a district court may not proceed with termination proceedings under ICWA or § 41-3-609, MCA, if a reason exists to believe that a child may be an Indian child. In re A.G. , ¶¶ 14-17. Accord 2015 Guidelines B.3(d), 80 Fed. Reg. at 10153 ("The State court may not substitute its own determination regarding a child's membership or eligibility for membership in a tribe or tribes."); see also 25 U.S.C. § 1912(a) ("No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by" parent/custodian and the tribe/Secretary of the Interior.). When a court has reason to believe a child may be an Indian child, proceeding to termination without a conclusive tribal determination of tribal membership or eligibility is an abuse of discretion. See In re A.G. , ¶¶ 14-17.
¶26 At the outset of this case, the State, through the Department, had reason to believe, as asserted in CPS Lebrun's affidavit in support of its initial petition, that D.E. and A.E. may be Indian children subject to ICWA. However, there is no evidence the Department ever formally sought or received a conclusive determination from the Blackfeet Tribe regarding the children's eligibility for tribal enrollment. The Department, and ultimately the District Court, instead relied on CPS Lebrun's hearsay testimony that he contacted the Blackfeet Tribe and, "They told me that they are not eligible, just they can only be descendent members." CPS Lebrun did not identify who he talked to, when he talked with that person, what position of authority, if any, that person held with the Blackfeet Tribe, or what it meant to be a ***306 "descendent member" of the Tribe. CPS Lebrun testified he had not received anything in writing from the Tribe. CPS Lebrun indicated he would expect something in writing if he requested written confirmation from the Tribe. There is no evidence CPS Lebrun followed up or made any written request of the Blackfeet Tribe to provide confirmation of what he thought had been orally related to him. The Department then inappropriately relied solely on CPS Lebrun's testimony, thereafter filing its Notice of No ICWA Involvement without any supporting documentation, affidavit, or direct testimony of any individual with authority to speak on behalf of the Blackfeet Tribe. While the Department may have reasonably believed CPS Lebrun's testimony, its reliance thereon was insufficient to satisfy its burden under ICWA to actively investigate further and make formal inquiry with the Tribe for a conclusive determination of the children's membership eligibility.
¶27 In In re L.D ., we addressed the court's responsibility to demand and ensure strict compliance with ICWA. In that case, like here, there was indication at the outset of the cause that L.D. may be an Indian child subject to ICWA. In re L.D. , ¶ 2. Throughout the proceedings, the court treated the case as *594 an ICWA case, using ICWA standards to terminate the father's parental rights to L.D. In re L.D. , ¶ 6. After terminating the father's parental rights, the court extended TLC to afford L.D.'s mother additional time to work her treatment plan. At her initial termination hearing, the State's ICWA expert testified the Department did not meet ICWA requirements and had not engaged in active efforts to avoid breaking up the Indian family, and that restoring L.D. to the mother's custody would not likely cause serious emotional or physical damage to L.D. As such, the court denied the State's petition and extended TLC. In re L.D. , ¶ 7. Approximately four months later, the State filed a second petition to terminate the mother's parental rights. At the second termination hearing, the State asserted L.D. was not an Indian child. L.D.'s mother did not object and the court then determined L.D. was not an Indian child subject to ICWA. In re L.D. , ¶ 8. We reversed this determination, concluding "a parent cannot waive application of ICWA by stipulation or acquiescence. Only an Indian tribe can determine whether a child is a member or eligible for tribal membership when, as here, a reason exists to believe that the child may be an Indian child." In re L.D., ¶ 16 (citation omitted). We discussed the Department's affirmative obligation to satisfy its ICWA burden and further concluded, "Though [the Department] gave due notice to the Tribe of the pendency of the initial foster care and subsequent parental rights termination proceedings, there is no evidence that the Department ever formally ***307 sought or received a conclusive tribal determination that L.D. was or was not eligible for tribal enrollment." In re L.D ., ¶ 15.
¶28 In this case, CPS Lebrun's testimony that an unidentified person orally confirmed that "they are not eligible, just they can only be descendent members" does not satisfy the Department's ICWA burden. As a direct result of the Department's failure to satisfy this burden-and likely assuming the Department had, prior to filing its Notice of No ICWA Involvement, followed up with formal inquiry with the Blackfeet Tribe as CPS Lebrun testified he would-the District Court proceeded to termination without conclusive determination from the Tribe. No documentation or testimony of an authorized tribal representative either dispelled or confirmed the District Court's and Department's belief that the children were not Indian children as defined by ICWA. Under the circumstances of this case, we hold the District Court erred by proceeding to terminate Mother's rights to D.E. and A.E. without a conclusive tribal determination of their tribal membership status and eligibility.
¶29 Accordingly, we hold the District Court abused its discretion in terminating Mother's parental rights without a conclusive tribal determination of tribal membership status and enrollment eligibility. We reverse and remand for an appropriate threshold determination of whether D.E. and A.E. are Indian children based on a conclusive tribal determination of tribal membership and eligibility in the Blackfeet Tribe. Further, if D.E. and A.E. are conclusively identified as Indian children subject to the requirements of ICWA, the District Court shall hold further proceedings as may be necessary to meet the evidentiary burdens of ICWA.
¶30 2. If ICWA does not apply, whether the District Court abused its discretion in terminating Mother's parental rights.
¶31 Although we reverse and remand the District Court's Order for further proceedings regarding the children's ICWA eligibility, since further investigation may lead to the determination that ICWA does not apply in this matter, we further consider Mother's argument that the District Court abused its discretion when it terminated her parental rights.
¶32 The District Court terminated Mother's parental rights pursuant to § 41-3-609(1)(f), MCA, which provides:
(1) The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence, except as provided in the federal Indian Child Welfare Act, if applicable, that any of the following circumstances exist:
...
*595 ***308 (f) the child is an adjudicated youth in need of care and both of the following exist:
(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.
¶33 The children were adjudicated as YINC on October 28, 2015. Mother does not assert the tasks required of her in her treatment plans were not appropriate nor does she contest the finding that she failed to complete various tasks of the treatment plans; rather she asserts that "the Department failed to meet its burden to prove by clear and convincing evidence that [Mother's] condition was unlikely to change within a reasonable time."
¶34 Although the District Court's written findings and conclusions could have-and should have-been more detailed, the District Court's oral findings and the record on the whole supports the court's termination of Mother's parental rights if ICWA does not apply. Mother admits she had a "nervous breakdown" when the children's father was murdered and had parenting difficulties because her husband had been the disciplinarian and the children did not listen to her. Shortly after the children were removed from her care, Mother's mental health deteriorated and she required a lengthy hospitalization at MSH. Upon release from MSH, rather than engaging with services and her children, Mother did not inform the Department as to her whereabouts and intentions and she remained out of contact for several months. Mother reappeared in February 2016, began working with the Department, and engaged in her treatment plan tasks. Although Mother did well for a period of time, she decompensated quickly, demonstrating erratic and inconsistent behavior after the children returned to her care. Drug testing showed Mother to be using methamphetamine, and due to Mother's inability to maintain a safe and stable home, the children had to again be removed from her care. Rather than increasing engagement with the Department and services to regain stability, Mother unilaterally stopped working on her treatment plan tasks. She stopped contacting her CPS worker, stopped attending therapy and was terminated from this service for non-attendance, and stopped participating in drug testing. At the termination hearing, Mother testified she ceased participating in these services because she did not believe she needed additional mental health therapy and she did not believe she had a problem with drugs. Even if her perceptions were accurate, unilaterally discontinuing ***309 participation in services and with the Department evidences extremely poor decision-making abilities. Mother was fully aware of the requirements of her treatment plan and the need to complete the treatment plan tasks in order to regain custody of her children. If she believed she no longer needed the services required by her treatment plan, at a minimum she should have contacted her CPS worker to discuss the situation and demonstrate why the services were no longer appropriate.
¶35 Mother now argues the District Court erred in finding Mother's condition was not likely to change within a reasonable period of time because it did not have any "competent evidence from professional persons concerning the existence of parenting deficits." It is at best disingenuous for Mother to unilaterally discontinue participation with mental health and chemical dependency professionals such that they have no current information about her and then cry foul that those same professionals provided no evidence of her current condition. Mother well understood that completion of her treatment tasks and ongoing engagement with mental health and chemical dependency professionals was the way she could demonstrate successful parenting abilities.
¶36 In addition to unilaterally discontinuing participation with services, Mother became manipulative and confrontational with the children, at times blaming them for the situation, lying to them about the Department, and making unrealistic promises to them. This caused D.E. to refuse to attend visits and A.E. to opine it is "OK" to terminate Mother's parental rights. Mother demonstrated *596 an inability to recognize that her decision to cease participation in services was problematic and that the nature of her interactions with D.E. and A.E. was detrimental to her children. This lack of insight and problem-solving abilities further supports the District Court's termination of her parental rights.
¶37 If D.E. and A.E. are not Indian children subject to ICWA requirements, the District Court did not abuse its discretion in terminating Mother's parental rights pursuant to § 41-3-609(1)(f), MCA. Therefore, if upon remand the District Court determines D.E. and A.E. are not Indian children subject to ICWA, it may re-enter judgment against Mother on the merits of its prior findings of fact and conclusions of law.
CONCLUSION
¶38 We conclude the District Court abused its discretion in terminating Mother's parental rights to D.E. and A.E. without a ***310 conclusive tribal determination of tribal membership status and enrollment eligibility. We accordingly reverse and remand for an appropriate threshold determination of whether D.E. and A.E. are Indian children based on a conclusive tribal determination of tribal membership and eligibility in the Blackfeet Tribe. Upon a finding and conclusion on a conclusive tribal determination that D.E. and A.E. are Indian children, the Court shall reset the State's termination petition for hearing and decision under § 41-3-609, MCA, and applicable ICWA standards. We further conclude the Court may re-enter judgment against Mother on the merits of its prior findings of fact and conclusions of law if it finds and concludes on a conclusive tribal determination that D.E. and A.E. are not Indian children.
¶39 Reversed and remanded for further proceedings consistent with this Opinion.
We concur:
BETH BAKER, J.
LAURIE McKINNON, J.
JAMES JEREMIAH SHEA, J.
JIM RICE, J.

Although CPS Lebrun mistakenly identified Mother as an enrolled member in his affidavit, he later learned Mother was not enrolled, but the birth father may have been.

ICWA requires proof beyond a reasonable doubt that a state seeking termination of parental rights to an Indian child has made "active efforts" to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful. In re A.L.D. , 2018 MT 112, ¶ 6, 391 Mont. 273, 417 P.3d 342 (citing 25 U.S.C. § 1912(d) ), while non-ICWA cases are subject to § 41-3-423, MCA, which requires the Department to make "reasonable efforts."

In 2016, the Secretary of the Interior incorporated some, if not all, of the 2015 Guidelines into "minimum Federal standards" for ICWA codified in Title 25, part 23, subpart 1, C.F.R. (eff. Dec. 12, 2016). See, e.g. , 25 C.F.R. 23.101 : "The regulations in this subpart clarify the minimum Federal standards governing implementation of [ICWA] to ensure that ICWA is applied in all States consistent with the Act's express language, Congress's intent in enacting the statute, and to promote the stability and security of Indian tribes and families."). As such, these "minimum Federal standards" for ICWA, inter alia, further prospectively inform as to the respective duties of the Department and district courts regarding ICWA tribal notice and "Indian child" determinations. See also 25 U.S.C. § 1912(a) (agency duty to give notice to the Secretary of the Interior "in like manner" if agency cannot determine "the identity or location of the parent or Indian custodian" and affiliated Indian tribe).

From the outset, the Department must ask and actively investigate "whether there is reason to believe" a subject child "is an Indian child" and, if so, the Department "must obtain verification, in writing, from all tribes in which it is believed that the child is a member or eligible for membership, as to whether the child is an Indian child." 2015 Guidelines B.2(a) and B.2(b)(2), 80 Fed. Reg. at 10152. For guidance in contacting and providing notice to an Indian tribe, see 2015 Guidelines A.4, 80 Fed. Reg. at 10152. In turn, district courts "must ask, as a threshold question ... whether there is reason to believe" that a subject child "is an Indian child by asking each party to the case, including the guardian ad litem and [Department] representative, to certify on the record whether they have discovered or know of any information that suggests or indicates the child is an Indian child." 2015 Guidelines B.2(b), 80 Fed. Reg. at 10152. "If an Indian child is a member or eligible for membership in more than one tribe, ICWA requires that the Indian tribe with which the Indian child has the more significant contacts be designated as the Indian child's tribe." 2015 Guidelines B.4(c), 80 Fed. Reg. at 10153 (with criteria for determining more significant contacts).