FILED

10/20/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 20-0075

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 262

IN THE MATTER OF:

M.T. and L.T.,

      Youths in Need of Care.

APPEAL FROM:     District Court of the Second Judicial District,
In and For the County of Butte/Silver Bow,
Cause Nos. DN 16-53 and DN 18-04
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

         Kelly Driscoll, Driscoll Hathaway Law Group, Missoula, Montana

     For Appellee:

         Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

         Eileen Joyce, Silver Bow County Attorney, Mark Vucurovich, Special
Deputy County Attorney, Butte, Montana

         Submitted on Briefs:  August 19, 2020

                 Decided:  October 20, 2020

Filed:

               _____
                           Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     C.T. (Mother) appeals from a judgment entered in the Second Judicial District Court, Silver Bow County (District Court), terminating her parental rights to her children, M.T. and L.T.

¶2     We restate the issues raised on appeal as follows:

1.  *Did the District Court err by terminating Mother's parental rights in absence of a conclusive tribal determination regarding the children's status as Indian Children of the United Keetoowah Band of Cherokee Indians?*

2.  *Did the Department engage in reasonable efforts to prevent removal and reunite Mother with Children?*

3.  *Did the District Court err by determining that the conduct or condition rendering Mother unfit, unable, or unwilling to parent was unlikely to change within a reasonable time?*

¶3     We affirm Issues 2 and 3, but remand for further consideration under the Indian Child Welfare Act, 25 U.S.C. §§ 1901–63 (ICWA).

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     M.T. was born in the spring of 2015.  On July 14, 2016, the Montana Department of Public Health and Human Services (Department) petitioned the District Court for Emergency Protective Services, Adjudication of Child as Youth in Need of Care, and Temporary Legal Custody of M.T.  The Department based the petition upon allegations of Mother and Father's[1] physical neglect, specifically, domestic violence and

---

[1] In June 2017, the District Court terminated the parental rights of Father.  He did not appeal and this appeal addresses only Mother's parental rights.

methamphetamine drug use, while caring for M.T. Three days earlier, a Department Child Protection Specialist (CPS) removed M.T. from Mother's care because Mother was exhibiting "aggressive and erratic" behavior that suggested drug use. The District Court granted the Department emergency protective services over M.T. the same day the Department filed its petition. L.T. had not yet been born.

¶5 In September 2016, the District Court approved a treatment plan for Mother. Under the plan, Mother was required to complete mental health and psychological assessments, attend mental health counseling, sign release forms allowing the Department and providers to discuss her case, complete parenting classes, exercise supervised visitation, complete a chemical dependency evaluation, abstain from drugs and alcohol, maintain safe and stable housing, and maintain contact with the Department. The Department agreed to provide referrals and help coordinate evaluation appointments, communicate weekly with Mother, meet bi-monthly with Mother, monitor treatment plan progress, and advise the court on treatment plan progress, problems, or changes.

¶6 In February 2017, the Department returned M.T. to Mother's care under an in-home safety plan. Mother had successfully addressed all aspects of her treatment plan. According to an affidavit filed in the proceeding to terminate Father's parental rights to M.T., CPS Ciana Dale (Dale) attested that M.T. "is doing well in birth mother's home . . . [t]here are no concerns with [M.T.] at this time." Mother gave birth to L.T. in June of 2017 and, in August, the District Court dismissed the proceeding, ending the Department's temporary legal custody of M.T.

3

¶7     In January 2018, the Department received a report that Mother had placed M.T. and L.T. in the care of their maternal grandmother (Grandmother) and left to reunite with Father. The Department suspected drug relapse and its attempts to locate Mother were unsuccessful. Grandmother did not have custodial authority over the children, and the Department removed them. Nine days after removal, the District Court granted the Department emergency protective services over the children. Three months later, the District Court adjudicated the children as youths in need of care and granted the Department temporary legal custody. The District Court also approved an uncontested treatment plan for Mother containing provisions like those in Mother's first treatment plan. Throughout 2018, Mother was sporadic and inconsistent with visitation, sometimes appearing under the influence of drugs or failing to notify the provider that she was unable to attend scheduled visitation times.

¶8     After being arrested on an outstanding warrant in August 2018, Mother entered the Montana Chemical Dependency Center (MCDC) in Butte, Montana, for treatment in lieu of incarceration. However, MCDC discharged Mother shortly thereafter following an incident in which she threatened another MCDC client. Mother then relapsed. The next month, while Mother was again living with Grandmother, a domestic violence incident occurred between Grandmother and Mother's brother. L.T. was involved in the incident. Mother promptly removed the children from Grandmother's home and brought them to the Department.

¶9 In December 2018, Mother was admitted again to MCDC. She engaged with treatment only minimally and left MCDC in early January 2019 after being involved in an aggressive verbal dispute with another MCDC client. At that point, the Department advised Mother that it intended to file a petition for termination of parental rights. In February, the Department moved for permanent legal custody and termination.

¶10 In January 2019, the children's foster care placement in Butte deteriorated, and the Department moved the children to Havre, Montana for a kinship placement. Mother exercised visitation with the children there, making scheduled round trips between Butte and Havre. The Department provided a travel voucher every other week. Ultimately, the Department did not license the kinship placement because of concerns that the placement parents did not vaccinate their children. At this time, Mother began sessions with Karen Reynolds, a clinical social worker, attending twenty-three appointments through early August 2019. Mother demonstrated sobriety during this time and sought out-patient treatment on her own.

¶11 A termination hearing was scheduled for April 11, 2019. M.T. and L.T.'s guardian ad litem originally opposed termination and advocated instead for transfer of Mother's case to Butte Family Drug Court. Dale, who was then handling Mother's case, testified at a later hearing, "so at that point I had agreed that, okay, I would give her one more chance, and this was her opportunity to really prove if she can parent the children." During the hearing, the Department sought dismissal of the termination proceeding, and moved for extension of temporary legal custody to provide Mother with additional time to engage in

her treatment plan. At the time of the initial petition for termination, the Department had not ceased providing Mother services, and visitation was occurring regularly in Havre.

¶12 In early April, Mother was admitted to Willow Way, part of the Rimrock Foundation in Billings, Montana, a treatment program designed for parents and their children. On April 11, the District Court ordered that Mother be enrolled in the Butte-Silver Bow Family Drug Court. The Drug Court accepted Mother on the condition that she successfully complete the Willow Way program. The Department initially resisted transfer of the children from Havre to Willow Way, but after advocacy by the guardian ad litem, the Department moved the children to Willow Way on April 17 to promote reunification. However, on May 19, Rimrock discharged Mother from Willow Way for program violations—Mother was confrontational with other clients and decided to leave the program—and the Department again removed the children from Mother. On June 4, the District Court dismissed Mother from Drug Court. The following day, June 5, 2019, the Department re-filed for termination of Mother's parental rights and permanent legal custody, and the District Court held a hearing on the Department's petition to approve permanency plans.

¶13 The termination hearing was held in August, and Dale testified that Mother had not been compliant with her treatment plan and abandoned her children through inconsistent contact and communication with them. As she explained:

> [Mother] just really hasn't been consistent with contact and communication throughout the kids' life. She has struggled to come and go from the kids' life. Her children really struggle with relationships due to the coming and going and the promises of, "Oh, you'll come home." And the kids just don't

> have the consistency to understand. They're four and two years old. They don't understand what all of this means. And to be jerked back and forth really has been very difficult on the kids.

Although Mother was then demonstrating sobriety, the Department sought termination of parental rights because Mother had failed specific components of her treatment plan— maintain safe housing, communicate with the department, parenting and visitation, and chemical dependency. At the time of the hearing, M.T. and L.T. had been placed in a stable foster home where they have since resided. M.T. continues to receive therapy, as she has since she was three years old.

¶14 Also at the termination hearing, Dale testified that Reynolds received a call from Grandmother stating Mother's father was a member of the Cheyenne Tribe. Mother testified she was potentially affiliated with a tribe, possessing 1/16th Cherokee blood quantum. The Department conducted further investigation and reported that, as of November 5, 2019, it had sent verification requests to the Cherokee Nation of Tahlequah, Oklahoma; the Eastern Band Cherokee of Cherokee, North Carolina; and the Catawaba Indian Nation of Rock Hill, South Carolina. In an affidavit, Dale attested that, "[t]o the best of my knowledge and belief, the child MAYBE an Indian Child subject to the Indian Child Welfare Act." (emphasis in original). All three of the notified tribes have reported that Mother's children are not eligible members.[2]

---

[2] The Northern Cheyenne Tribe of Montana also reported that Mother, M.T., and L.T. are not enrolled members.

¶15 On January 9, 2020, the District Court terminated Mother's parental rights as to M.T. and L.T. The District Court found ICWA inapplicable based upon the Department's investigation. Mother appealed. In an order entered on April 17, 2020, this Court consolidated *In the Matter of M.T.*, Cause No. DA 20-0075 and *In the Matter of L.T.*, Cause No. DA 20-0076 under a single cause number, *In the Matters of M.T. and L.T.*, DA 20-0075.

## STANDARDS OF REVIEW

¶16 Under §§ 41-3, MCA and 21 U.S.C. §§ 1901-63, this Court reviews a district court decision to terminate parental rights for an abuse of discretion. *In re S.R. and C.R.*, 2019 MT 47, ¶ 9, 394 Mont. 362, 436 P.3d 696 (internal citations omitted). This Court will reverse an evidentiary ruling if the district court acted either "arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *In re R.L., K.S., and T.S.*, 2019 MT 267, ¶ 12, 397 Mont. 507, 452 P.3d 890 (internal citation omitted).

¶17 This Court reviews a district court's findings of fact for clear error and its conclusions of law for correctness. *In re K.H. and K.M.*, 2012 MT 175, ¶ 19, 366 Mont. 18, 285 P.3d 474. Factual findings are clearly erroneous if not supported by substantial evidence, the court misapprehends the effect of the evidence, or if review of the record convinces this Court that a mistake was made. *In re R.L.*, ¶ 12 (internal quotations and citations omitted).

**DISCUSSION**

¶18    *1. Did the District Court err by terminating Mother's parental rights in absence of a conclusive tribal determination regarding the children's status as Indian Children of the United Keetoowah Band of Cherokee Indians?*

¶19    Mother argues the Department did not seek verification from the United Keetoowah Band of Cherokee Indians (United Keetoowah) to determine whether M.T. and L.T. are Indian Children under ICWA, and therefore the District Court erred by ruling ICWA was inapplicable. The State does not oppose remand for the District Court to make a further judicial determination regarding the children's Indian Child status, but opposes reversal of the judgment pending that determination, arguing that, under the circumstances here, the possibility that the children satisfy the definition of an Indian child is "highly improbable" and the oversight is harmless, given that an ICWA determination would not require the termination proceeding to begin anew, citing *In re D.E. and A.E.*, 2018 MT 196, ¶ 29, 392 Mont. 297, 423 P.3d 586.

¶20    It is the declared policy of the United States of America to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902. *See also Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642, 133 S. Ct. 2552, 2557 (2013); *In re D.E.*, ¶¶ 23-25. ICWA imposes heightened federal standards for "child custody proceedings" involving an "Indian child." 25 U.S.C. § 1903(1) (defining "child custody proceedings" to include "termination of parental rights"); 25 U.S.C. § 1903(4) (defining "Indian child" as any "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian

9

tribe and is the biological child of a member of an Indian tribe"); 25 U.S.C. § 1912(f) (stating that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child").

¶21 Whenever a court "knows or has reason to know" that a child is an "Indian child" under ICWA, the court is to verify the child's status prior to conducting termination proceedings. 25 U.S.C. § 1912(a); *In re L.D.*, 2018 MT 60, ¶ 13, 391 Mont. 33, 414 P.3d 768 (internal citations omitted). Whether a child is eligible for tribal membership is a question of fact dependent upon the child's actual ancestry, and an Indian tribe provides the determination conclusively as a matter of law. 25 C.F.R. § 23.108(b); *In re L.D.*, ¶ 14 (internal citations omitted); *In re Adoption of Riffle*, 273 Mont. 237, 242, 902 P.2d 542, 545 (1995).

¶22 It follows that a district court does not have authority to make a *de novo* conclusion regarding eligibility. 25 C.F.R. § 23.108(b); *In re L.D.*, ¶ 14 (internal citations omitted). Instead, the district court must determine "(1) whether the court has reason to believe that a subject child may be an 'Indian child' and (2) whether an Indian tribe has conclusively determined that the child is a member or eligible for tribal membership." *In re L.D.*, ¶ 14 (internal citations omitted). Absent a conclusive tribal determination, a court abuses its discretion by terminating parental rights if there is "reason to believe" the child is an Indian child. *In re L.D.*, ¶ 14 (internal citation omitted).

¶23 We hold the District Court abused its discretion in terminating Mother's parental rights without a conclusive tribal determination of tribal membership status and enrollment eligibility in the United Keetoowah. Since the United Keetoowah is a federally recognized Cherokee tribe,[3] and the Department did not contact the tribe, the District Court made a *de novo* determination regarding M.T. and L.T.'s United Keetoowah tribal eligibility, a determination which is in the sole province of the tribe. We reverse and remand for an appropriate threshold determination of whether M.T. and L.T. are Indian children based on a conclusive tribal determination of tribal membership and eligibility in the United Keetoowah tribe. Regardless though, we further consider Mother's argument that the District Court abused its discretion when it terminated her parental rights. *See, e.g., In re L.D.*, ¶ 18; *In re D.E.*, ¶ 38.

¶24 *2. Did the Department engage in reasonable efforts to prevent removal and reunite Mother with Children?*

¶25 The right to parent one's child is a fundamental right. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2004) (discussing the Supreme Court of the United States first recognition of the liberty interest of "parents in the care, custody, and control of their children"); *J.N.S. v. A.W.*, 2014 MT 322, ¶ 16, 377 Mont. 234, 339 P.3d 414 (internal citations omitted); *In re C.J.*, 2010 MT 179, ¶ 26, 357 Mont. 219, 237 P.3d 1282 (stating that "termination procedures must satisfy the Due Process Clause of the Fourteenth

---

[3] *Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 84 Fed. Reg. 1200 (Feb. 1, 2019).

Amendment") (internal citation omitted). Among other statutorily provided circumstances, for a Montana court to order termination of the parent-child relationship, the court must make a "finding established by clear and convincing evidence"[4] that "the child is an adjudicated youth in need of care"[5] and "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(1)(f), MCA. Because the termination of parental rights involves a fundamental liberty interest, the district court "must adequately address each applicable statutory requirement" before terminating parental rights. *In re R.J.F.*, 2019 MT 113, ¶ 25, 395 Mont. 454, 443 P.3d 387.

¶26 Mother argues the District Court erred by terminating her parental rights without clear and convincing evidence that she was unlikely to change within a reasonable time. Mother bases this argument on the contention that the Department failed to make reasonable efforts to reunite her with the children. Comparing her case to *In re R.J.F.*, Mother argues the Department did not make reasonable efforts for contact by placing the children in Havre and initially prohibiting their placement with her at Willow Way. Mother contends the Department unreasonably failed to coordinate with her service providers and

---

[4] In this context, "clear and convincing evidence" means that the statutory criteria for termination must be "definite, clear, and convincing" by a preponderance of the evidence. *In re R.L.*, ¶ 12 (internal citation omitted).

[5] "[A] youth who has been adjudicated or determined, after a hearing, to be or to have been abused, neglected, or abandoned." Section 41-3-102(33), MCA.

stopped working with her after she was making significant progress on issues that led to the Department's involvement. The State responds that Mother ignores many of the Department's efforts and fails to acknowledge that she did not engage with the Department for a significant time, after previously completing a treatment plan and having her children returned.

¶27 The Department is required to make "reasonable efforts" to prevent the necessity of removal of a child from the child's home and to reunify families separated by the state. Section 41-3-423(1), MCA. This is not a separate requirement for termination but may be a predicate for finding that a parent's conduct or condition is unlikely to change within a reasonable time. *In re Matter of C.M.*, 2019 MT 227, ¶ 22, 397 Mont. 275, 449 P.3d 806 (stating that "a conclusion that a parent is unlikely to change could be called into question if the Department failed to make reasonable efforts to assist the parent."). "To meet this reasonable effort requirement, the Department must in good faith develop and implement treatment plans designed to preserve the parent-child relationship and the family unit." *In re B.F. and A.F.*, 2020 MT 223, ¶ 42, 401 Mont. 185, ___ P.3d ___ (internal citation omitted). The "reasonable efforts" inquiry is "highly fact dependent." *In re B.F.*, ¶ 41. What constitutes "reasonable efforts" is not "static or determined in a vacuum" but dependent on the "totality of the circumstances." *In re R.L.*, ¶ 22. The Department is not required to make "herculean" efforts because parents have an affirmative obligation to "avail" themselves of the Department's services and engage with the Department to successfully complete treatment. *In re B.F.*, ¶ 42 (internal citations omitted).

¶28 In an otherwise spartan termination order, the District Court addressed reunification by delineating 46 individual tasks undertaken by the Department to further reunification, including several tasks related to facilitating Mother's visitation with the children. While Mother correctly argues that child placement is a significant consideration, and the Havre placement was not an ideal location for Mother to access the children, our review of the record convinces us the Department's conduct did not suffer the deficits we noted in *In re R.J.F.*, where Mother lived in Williston, the Department placed and encouraged a newborn's development and attachment with a foster family in Billings, and only arranged visits for the Birth Mother "whenever she was in town or whenever she could make it to town." *In re R.J.F.*, ¶¶ 32-37. After Mother moved to Billings to be near her child, the Department commenced termination proceedings.

¶29 The Department's actions here are much different than in *In re R.J.F.* A year after the Department again became involved with Mother, when the children's Butte placement deteriorated, the Department located the kinship placement in Havre, believing it to be in the best interests of the children while Mother sought treatment and stable housing. After Mother was accepted into Willow Way in Billings, the Department initially resisted moving the children in with Mother, but eventually did so. However, a few weeks later, Willow Way discharged Mother due to similar aggressive behavior she had displayed several months earlier at MCDC. And, while no realistic efforts were put forth in *In re R.J.F.*, the Department here made treatment referrals for the SMART program, MCDC, Drug Court, and assisted with Willow Way. The Department also communicated with

14

Reynolds, Mother's out-patient provider, even though the releases were never sorted out between parties. The Department assisted with arrangements and provided travel vouchers to help Mother exercise visitation in Havre. Despite these efforts, Mother failed to make significant progress on her treatment plan goals until after the Department initiated a second termination proceeding. Under the standard of review governing this issue, including assessment of the District Court's detailed findings, we cannot conclude the District Court erred in finding the Department made reasonable efforts in reuniting Mother with the children.

¶30    *3. Did the District Court err by determining the conduct or condition rendering Mother unfit, unable, or unwilling to parent was unlikely to change within a reasonable time?*

¶31    The District Court found that Mother "has not complied with her treatment plan and has failed it completely" and that "[c]ontinuation of the parent child legal relationship will likely result in continued abuse or neglect." Mother argues that insufficient evidence existed to establish that her condition was unlikely to change within a reasonable time, and that a continued relationship between Mother and the children would result in further abuse or neglect. Specifically, Mother points to the progress made in addressing her addiction and mental health issues by staying sober for eight months prior to the termination hearing, and actively participating in out-patient services.

15

¶32 For a court to determine whether a parent's unfit "conduct or condition"[6] is unlikely to change within a reasonable time under § 41-3-609(1)(f)(ii), the court "shall enter a finding" that a continued parent-child relationship will "likely result in continued abuse or neglect" or that the parent's conduct renders them "unfit, unable, or unwilling to give the child adequate parental care." Section 41-3-609(2), MCA. Under this statute, the main inquiry is "whether the parent is likely to make enough progress within a reasonable time to overcome the circumstances rendering her unfit to parent." *In re A.B.*, 2020 MT 64, ¶ 27, 399 Mont. 219, 460 P.3d 405 (internal citation omitted). The court must consider a variety of factors surrounding a parent's individual past and present conduct and circumstances. Section 41-3-609(2)(a)-(d), MCA. In considering these factors, "the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA.

¶33 We conclude the District Court did not err in entering both a finding of fact and a conclusion of law, in both of the children's cases, that a continued relationship between Mother and the children will likely result in further abuse or neglect. The finding was supported by substantial evidence. The District Court had to balance Mother's recent positive efforts with other factors requiring consideration, including her extensive past conduct and conditions that have continually reoccurred to undermine her ability to consistently parent her children during their early development. Under the first removal,

---

[6] "Conduct or condition" means circumstances or reasons causing the treatment plan to be unsuccessful. *In re J.B.*, 2016 MT 68, ¶ 22, 383 Mont. 48, 368 P.3d 715.

16

Mother was able to comply with her treatment plan and regain custody of her children. However, that status was short-lived, as Mother soon left the children and embraced once again a lifestyle dominated by her disabling conditions. Following the second removal of the children, Mother consistently demonstrated concerning behavior—unstable housing, aggressive behavioral incidents, inconsistent communication, unreliable visitation practices (prior to termination proceedings and the Havre placement), and failed urine analyses—which Mother failed to address until the Department initiated termination proceedings. The "primary consideration" of this element of termination is "the physical, mental, and emotional conditions and needs" of M.T. and L.T., who now have spent most of their lives in the custody of the Department. Section 41-3-609(3), MCA. As Dale pointed out, M.T. is "struggling emotionally with attachment" and "constantly needing to be reassured that people will return to her life." She undergoes therapy care to address the trauma she has already endured from her immediate family. Children do not remain in a holding pattern as a parent grapples with disabling conditions; time moves on and they continue to grow and require parental care. We conclude the District Court did not err in its conclusions.

**CONCLUSION**

¶34 We conclude the District Court abused its discretion by terminating Mother's parental rights without a conclusive determination of M.T. and L.T.'s tribal membership status and enrollment eligibility with the United Keetoowah tribe. We reverse and remand to allow the Tribe to make a conclusive determination regarding M.T. and L.T.'s

17

membership and enrollment eligibility. If the United Keetoowah tribe concludes that M.T. and L.T. are tribal members or eligible for enrollment, the District Court shall conduct anew the termination proceedings under applicable ICWA standards and § 41-3-609, MCA. If the United Keetoowah tribe concludes the contrary, the District Court may re-enter judgment against Mother on the merits of its prior findings of fact and conclusions of law.

¶35     Reversed and remanded for further proceedings consistent with this Opinion.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR