FILED

01/14/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 24-0216

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 6

IN THE MATTER OF:

L.B. and R.B.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause Nos. DN-21-51(C) and
DN-21-52(C)
Honorable Heidi J. Ulbricht, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Kelli S. Sather, Kelli S. Sather, PLLC, Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
      Attorney General, Helena, Montana

      Travis R. Ahner, Flathead County Attorney, Katherine A. Handley, Deputy
      County Attorney, Kalispell, Montana

Submitted on Briefs:  October 9, 2024

Decided:  January 14, 2025

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1    Father appeals the March 25, 2024 Decree of Guardianship entered by the Eleventh Judicial District Court, Flathead County. The District Court concluded placement with father was not in the children's best interests and any further efforts to reunify children with father would be unproductive. The court did not terminate father's parental rights; however, it declared R.D., a foster caregiver selected by Child Protective Services (CPS), to be the legal guardian of father's two children, L.B. and R.B.[1]

¶2    We restate the issues on appeal as follows:

> *1. Whether the District Court erred by finding the Department made active efforts to reunify father with his children.*
>
> *2. Whether the District Court erred in concluding further reunification efforts would be unproductive and not in the children's best interests.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    The children were removed from father and mother's care in December 2021. The Department of Public Health and Human Services, Child and Family Services Division (the Department) placed the children in foster care with R.D. Reasons for removal included the family's homelessness, father and mother's domestic violence, and father's admitted alcoholism. Prior to the removal and prior to initiating legal action, CPS workers tried helping the family from July 2021 through December 2021. During this time, CPS kept in regular contact with the parents and supplied them with formula, diapers, baby food,

---

[1] The children were determined to be Indian children under the Indian Child Welfare Act (ICWA) and Montana Indian Child Welfare Act (MICWA). The children's Tribe consented to R.D. becoming the children's legal guardian.

clothing, and over $300 in gift cards. Father resided at various locations, sometimes with the rest of the family and sometimes alone, including the Samaritan House shelter, the Warming Center shelter, hotels, transient camps, and in a tent. The family was frequently evicted or barred from shelters due to domestic disturbances.

¶4 Father entered five treatment facility programs—completing two. Additionally, Father chose not to join a treatment court program because he believed he did not need help. Upon discharge from every treatment program, father returned to living on the streets and was unable to maintain his sobriety. As a result of father's inability to maintain sobriety and safely parent the children, the Department filed for emergency protective services over the children. Father stipulated to emergency protective services, and the District Court granted it on December 22, 2021.

¶5 On February 25, 2022, father stipulated to adjudicating the children as youths in need of care (YINC), and the District Court granted the Department temporary legal custody. Nineteen months later, on September 5, 2023, the Department requested a permanency plan for the children to be placed in state-sponsored guardianship. The District Court held a guardianship hearing and listened to testimony from a CPS worker, an ICWA expert, and a social worker from the Public Defender's Office. After hearing the evidence, the District Court ordered the children to be placed with R.D. as their legal guardian.

¶6 On appeal, father concedes the Department made some active efforts including inviting his Tribe to participate in providing services to the family, diligently searching for extended family members, keeping the siblings together, and monitoring progress and

3

participation in services. However, father claims the Department failed to help him overcome barriers to maintaining his sobriety and obtaining housing. Father asserts the Department may have identified resources to help him, but it did not actively assist father in accessing those resources by transporting him to and from, filling out his applications, and making sure his applications were submitted correctly. According to father, a referral for services is not sufficient to constitute active efforts.

¶7 The Department argues it "made affirmative, active, thorough, and timely efforts for this family, tailored for getting the parents substance abuse treatment." In addition to providing services designed to maintain the children in father's care prior to initiating legal action, the Department asserts it made extraordinary efforts to locate father while he was living on the streets, gave him multiple cell phones, referred him to treatment services—including through a Native American provider which father refused, and contacted a Native American Service Provider to learn how to communicate better with father. Despite these efforts, the Department asserts father did not maintain contact, refused most of the treatment options, and exhibited no sustained progress.

## STANDARD OF REVIEW

¶8 We review a district court's factual findings for clear error. *In re B.J.J.*, 2019 MT 129, ¶ 9, 396 Mont. 108, 443 P.3d 488. A finding of fact is clearly erroneous when it is not supported by substantial evidence, the court misapprehended the effect of the evidence, or review of the record convinces this Court a mistake was made. *In re B.J.J.*, ¶ 9. We review conclusions of law de novo for correctness. *In re D.E.,* 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586.

4

**DISCUSSION**

¶9 *1. Whether the District Court erred by finding the Department made active efforts to reunify father with his children.*

¶10 A district court may appoint a guardian for a child if: the Department has given its written consent; the child has been adjudicated a YINC; the Department made reasonable efforts to reunite the parent and child, further efforts to reunite would be unproductive, and reunification would not be in the child's best interests; the child has lived with the guardian in a family setting; it is in the child's best interest to remain with the guardian; and if the child is an Indian child, the child's Tribe was notified of the proceedings. Section 41-3-444, MCA.

¶11 Furthermore, appointing a guardian to an Indian child creates a "foster care placement" which has additional requirements under MICWA. "Foster care placement" of an Indian child means removing the child from the child's parent for temporary placement in a foster home with a guardian where the parent cannot not have the child returned on demand, but parental rights have not been completely terminated. Section 41-3-1303(6), MCA. A party seeking foster care placement of an Indian child must show the court that active efforts were made to provide rehabilitative services and programs to prevent the breakup of the Indian family, and those efforts were unsuccessful. Section 41-3-1319(1), MCA. "Active efforts" includes "affirmative, active, thorough, and timely efforts meeting the requirements of 41-3-1319 that are intended primarily to maintain or reunite an Indian child with the child's family and that are tailored to the facts and circumstances of the case." Section 41-3-1303(1), MCA.

5

¶12 Active efforts must include assisting the parents through the steps of a case plan and helping them access or develop the resources necessary to complete the plan. Section 41-3-1319(3), MCA. Active efforts "must be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's tribe and conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and tribe." Section 41-3-1319(4), MCA. Active efforts may include, but are not limited to:

(i) conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

(ii) identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining the services;

(iii) identifying, notifying, and inviting representatives of the Indian child's tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

(iv) conducting or causing to be conducted a diligent search for the Indian child's extended family members and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(v) offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's tribe;

(vi) taking steps to keep siblings together whenever possible;

(vii) supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(viii) identifying community resources, including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the child's parents or, when appropriate, the child's family, in accessing and using the resources;

(ix) monitoring progress and participation in services;

(x) considering alternative ways to address the needs of the Indian child's parents and, when appropriate, the family, if the optimum services do not exist or are not available; and

6

(xi) providing postreunification services and monitoring.

Section 41-3-1319(4), MCA. Finally, merely referring a parent to a service or program does not constitute an active effort if the referral was the sole action taken. Section 41-3-1319(4)(b), MCA.

¶13 A court may order a foster care placement if: (1) active efforts were made to provide remedial services and rehabilitative programs but those efforts were not successful; and (2) "continued custody by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child," as supported by testimony from a qualified expert witness. Section 41-3-1320(1)(a), (b), MCA. "Evidence showing only the existence of community or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute clear and convincing evidence . . . that continued custody is likely to result in serious emotional or physical damage to the child." Section 41-3-1320(3)(b), MCA.

¶14 Here, the District Court determined the Department made sufficient active efforts to reunite father with the children based on testimony and evidence presented at the guardianship hearing, including expert witness testimony from an ICWA expert. The testimony established that prior to removal of the children, the Department searched for the family's whereabouts, met with the parents and performed a comprehensive assessment of the circumstances of the family, with a focus on safe reunification as the most desirable goal, assessed the health of the children, provided assistance with housing, transportation, and gift cards, referred the parents to mental health, substance abuse, and peer support

services, transported the parents to obtain goods and services, visited mother in jail, and visited the parents at various temporary living locations.

¶15 The Department continued to make active efforts after the children were removed. The Department organized and supervised visitation between father and the children through Bear Logic Family Center. The Department organized mental health and chemical dependency evaluations for both parents. The District Court invited father to participate in drug treatment court, but he rejected that option. The Department also set up alcohol/drug testing through Compliance Monitoring Systems (CMS). The Department organized family engagement meetings in which Tribal representatives also participated. The Department made a diligent effort to search for other family members or other Tribal members who were willing to take in the children. The Department also developed treatment plans for both parents that were specially tailored to address the parents' substance use and other issues.

¶16 The Department also purchased multiple cell phones with calling plans for father. The Department drove father to the Social Security office and the sober living facility, Stepping Stones, and assisted him in filling out an application for housing—however father did not submit the application. The Department also sent a supportive letter to father, provided photos of the children, and visited him while he was in treatment to encourage him.

¶17 The Department also implemented services for the children. For example, the Department set up a play-therapy referral and speech therapy for each child. The Department organized surgeries to implant ear tubes for both children followed by

8

occupational therapy. The Department set up evaluations for both children at the Child Development Center. The Department got L.B. enrolled in a Head Start program. The Department regularly visited the children while in foster placement. The Department arranged for R.B. to be tested at Shodair Children's Hospital for genetic problems related to fetal alcohol spectrum disorder and treatment of R.B.'s seizures. The Department assessed R.B. to determine if the child qualified for social security disability insurance. The Department facilitated contact between the children and Tribal members to ensure the continuation of their Native American traditions in the children's upbringing.

¶18 Based on the facts listed above, we conclude the District Court did not err in determining the Department made active efforts sufficient to meet the requirements of MICWA. The Department remained involved in father and the children's lives throughout the proceedings and provided numerous services throughout. Father's unwillingness to participate does not negate the Department's active efforts. *See In re D.S.B.*, 2013 MT 112, ¶¶ 15–17, 370 Mont. 37, 300 P.3d 702. Father either refused certain treatment options, did not complete others, or did not take any steps to maintain his sobriety after leaving a treatment facility—despite the Department's assistance. Father did not maintain contact with the Department which made working with him to complete his treatment plan difficult—despite the Department purchasing multiple cell phones for him.

¶19 Additionally, because "active efforts" are intended to prevent the breakup of an Indian family, a court may appropriately consider efforts provided to the child's other

parent when evaluating the total "active efforts" and whether they were unsuccessful.[2] *In re D.S.B.*, ¶ 17. Here, the Department tried to contact mother multiple times via her cell phone and by sending her Facebook messages. The Department contacted the Blackfeet Tribe, Flathead Indian Reservation, mother's relatives, the U.S. Marshalls, and the Billings Police to try and locate her. The Department also searched for her in shelters across the state where they thought she might be located. However, mother did not contact the Department for over two years. In January 2024, just prior to the guardianship hearing, mother sent a text to a CPS worker, but she still did not come forward and remained unable to be located.

¶20    As such, we conclude the District Court did not err in its factual findings that the Department made sufficient active efforts to reunite father with the children.

¶21    *2. Whether the District Court erred in concluding further reunification efforts would be unproductive and not in the children's best interests.*

¶22    Father argues the District Court erroneously found that further efforts by the Department to reunite him with the children would likely be unproductive, as required by § 41-3-444(2)(d), MCA. Based on the evidence above, we find that further efforts to reunify father with the children would likely not be productive because father has demonstrated little to no ability to change his behavior over the past three years that the Department has been working with him. Reunification is also not in the children's best interest because father has not demonstrated he can safely parent the children. Finally, the

_____

[2] Although we do note that it would be insufficient to terminate or suspend a parent's parental rights based only upon active efforts provided to the other parent.

10

children's Tribe also recommended the children be placed with a guardian, rather than father, for their own well-being.

## CONCLUSION

¶23 We affirm the District Court's granting of legal guardianship over father's children to R.D. The Department made continuous, active efforts from 2021 until 2023 to assist father in his treatment plan and reunify him with the children. Despite the Department's assistance over the course of two years, father's behavior did not change. As such, further efforts to reunify father with the children at this time would be unproductive.

/S/ INGRID GUSTAFSON

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

11