DA 24-0703

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 114

IN THE MATTER OF:

P.E.W.,

     A Youth in Need of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DN 21-300
Honorable Rod Souza, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

     Shannon Hathaway, Hathaway Law Group, Missoula, Montana

     For Appellee:

     Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

     Scott Twito, Yellowstone County Attorney, Heather Webster,
Deputy County Attorney, Billings, Montana

Submitted on Briefs: April 30, 2025

Decided: June 3, 2025

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 K.B. (Mother) appeals from the November 1, 2024 order of the Thirteenth Judicial District Court, Yellowstone County (Order), terminating her parental rights to her daughter, P.E.W.[1] Mother contends the Montana Department of Public Health and Human Services Child and Family Services Division (Department) failed to engage in active efforts to assist her in reunifying with her Indian child, and that the District Court wrongly approved a non-Native American foster placement for P.E.W., in violation of ICWA.

¶2 We address the following issues:

1. *Did the District Court abuse its discretion by concluding the Department engaged in "active efforts," as required under ICWA, before terminating Mother's parental rights?*

2. *Did the District Court err by approving on the basis of good cause a deviation from ICWA placement preferences for P.E.W.?*

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 K.B.'s minor children, B.J.B. and P.E.W., were removed from her care on October 28, 2021, based on allegations of physical neglect and abuse. On November 3, 2021, the Department filed a Petition for Emergency Protective Services (EPS), Adjudication as Youth in Need of Care (YINC), and Temporary Legal Custody (TLC) of B.J.B. and P.E.W. due to Mother's chemical dependency, exposure to domestic violence,

---

[1] A companion case involving another of Mother's children is also pending on appeal. After initially consolidating the appeals, we issued an order deconsolidating the appeals and returning the cases to their original cause numbers. *In re B.J.B. and P.E.W.*, No. DA 24-0702, Order (Feb. 24, 2025). A separate opinion has been simultaneously issued in Cause No. DA 24-0702, regarding B.J.B., who is not an Indian child under the Indian Child Welfare Act (ICWA).

2

and overall instability. Mother told a Child Protective Services (CPS) worker that she had used "a lot of meth" for "a long time," and stated she was bipolar and involved in a "verbal and physically abusive relationship" with a woman named Stephanie. P.E.W. was then three years old and living with her paternal grandmother, and initially remained in that placement following the Department's intervention.

¶4    At an EPS hearing on November 9, 2021, Mother stipulated to the Department's intervention and P.E.W.'s placement with her grandmother. Mother was then homeless and maintained contact with P.E.W. by phone. After a show cause hearing on November 23, 2021, the District Court determined that placement of P.E.W. in Mother's care at that time would be "contrary to the welfare of the child." At a dispositional hearing on January 4, 2022, which Mother attended with counsel, the District Court adjudicated P.E.W. as a YINC under § 41-3-102(35) (2021), MCA, granted TLC to the Department, and determined that ICWA applied, as S.W. (Father) was an enrolled member of the Northern Cheyenne Tribe (the Tribe). The District Court advised Mother to consider participation in Family Recovery Court and ICWA Family Recovery. Mother did not object to any of the District Court's determinations and agreed to seek transfer of the case to Family Recovery Court.

¶5    On January 19, 2022, the Department submitted a proposed treatment plan for Mother (Treatment Plan), outlining the following tasks for Mother: 1) complete a chemical dependency evaluation and follow the provider's recommendations; 2) engage in random drug testing to pursue sobriety; 3) schedule ongoing individual counseling; 4) attend

regular visits with P.E.W.; 5) complete a domestic violence risk assessment; 6) meet regularly with CPS and inform CPS of her whereabouts and household information; and 7) obtain stable housing and a legal source of income. Mother enrolled in ICWA Family Recovery on January 27, 2022. At a February 1, 2022, hearing to consider the Treatment Plan, Mother raised no objections to the Treatment Plan and said she was pursuing Family Recovery Court. Mother's motion to transfer to Family Recovery Court was granted on February 28, 2022. However, the case was subsequently transferred back to the District Court because Mother failed to comply with the recovery court's rules.

¶6    CPS worker Caitlyn Saunders (Saunders) was initially assigned to P.E.W.'s case. Saunders interviewed Mother and Father about family members that might offer a permanent placement for P.E.W. From this, Saunders evaluated, in addition to P.E.W.'s paternal grandmother, an aunt and an uncle for possible placement. The aunt was unwilling to provide care for P.E.W. The uncle was nineteen, unmarried, without children of his own, and was unable to care for P.E.W. P.E.W. remained with her paternal grandmother.

¶7    Over the next several months, the Department documented that Mother missed numerous urinalyses, tested positive for methamphetamine, cancelled visitations with P.E.W., and entered and left various treatment facilities, programs, homeless shelters, and sober living centers. The District Court found that "CPS Saunders worked to end [Mother's] homelessness and get [Mother] into sober living where she could have her children," and helped Mother secure "services for domestic violence victims, mental health issues, and chemical dependency." It further found that "CPS Saunders also assisted with

4

[Mother's] repeated admittance into detoxification, inpatient, and other chemical dependency treatment."[2]

¶8 On July 5, 2022, the Department filed a petition for extension of TLC and requested a permanency hearing. The petition was supported by the affidavit of CPS Lindsey Brunner (Brunner), who had been assisting Mother alongside Saunders since January 2022. Brunner's affidavit catalogued additional efforts being taken by the Department through the summer of 2022 to ensure Mother had the opportunity to reunify with P.E.W., including transporting Mother to and from drug testing and treatment court, taking her to homeless shelters, providing her with clean clothes, taking her to do laundry, facilitating visitation between Mother and P.E.W and providing her rides to visitation, getting her mail, bringing her food and SNAP cards, and providing other transportation, including purchasing bus passes. Brunner also testified that, despite making contact with Father twice, Father had not expressed a desire to comply with his treatment plan or attend visitations with P.E.W.

¶9 After a TLC extension hearing on October 11, 2022, the District Court found that, based upon ICWA-qualified expert witness Edith Adams' (Adams) testimony, "the continued custody of [P.E.W] by the parents is likely to result in serious emotional or physical damage to the child due to [Mother's] chemical dependency issues and [Father's] lack of involvement." While Mother then appeared to be making progress on sobriety and compliant with most of her Treatment Plan, she still did not have stable housing. The

---

[2] The District Court explained that CPS Saunders worked "for almost three years for this family," but was removed from the case due to a conflict of interest that arose after Saunders' parents became a proposed permanent placement option for P.E.W.'s sibling, B.J.B.

District Court granted the Department's motion for an extension of TLC and set a status hearing for December 6, 2022. At that status hearing, the Department represented that, in less than two months, Mother had relapsed and was "not engaged in [chemical dependency] treatment . . . she left without finishing. Previously she was exited from the Family Recovery Court and she needs to get back in touch with treatment. She's living at the Howard Johnson . . . she's not working, does not have a vehicle." The Department also explained that P.E.W's paternal grandmother would no longer be able to care for her long-term, and that permanency for P.E.W. may require a different residential placement.

¶10 The Department filed a second TLC extension petition on April 26, 2023. At that point, Mother had completed a chemical dependency evaluation, participated in random drug and alcohol testing, attended counseling sessions, attended visits with P.E.W., and met regularly with CPS, but remained unemployed and did not have stable housing. During this time, the Department continued to give Mother rides to visitations and drug testing, provide monetary assistance, and make referrals to treatment facilities where Mother could also reside. This petition and supporting affidavit noted that P.E.W. had been transferred out of her grandmother's home and into a state-licensed foster home with a non-Native American family because of "reports of physical abuse by grandmother's boyfriend and [F]ather residing at the residence." P.E.W. initially resided in a foster home that included B.J.B., but did not adapt well to being in a home with multiple children. Thus, P.E.W. was transferred to another non-Native American licensed foster home where she was enrolled in preschool and began progressing toward developmental milestones. The Department

6

estimated it would take another six months for Mother to complete her Treatment Plan and continued to seek reunification as a potential outcome, but also noted that the next six months would be "critical" in determining a permanent placement for P.E.W. The District Court held a permanency hearing on May 23, 2023, and continued the hearing to allow for additional proceedings in B.J.B.'s case and for Father to obtain counsel.

¶11 On August 15, 2023, the District Court held a TLC extension hearing wherein Adams again opined that returning P.E.W. to Mother's care would be "contrary to the welfare of the child." Mother stipulated to the extension of TLC and her counsel stated: "[m]y client is okay with where [P.E.W.] is at." The District Court noted that P.E.W.'s placement was "not in compliance with the placement preferences set forth in 25 U.S.C. § 1915 of [ICWA]," but that "[n]o suitable placement that is compliant with ICWA's placement preferences was able to be identified despite the Department's diligent search efforts." The District Court granted the second extension of TLC and approved P.E.W.'s continued foster placement.

¶12 At a status hearing on October 10, 2023, the Department reported Mother had once again relapsed and was then living in a treatment facility called Hannah House. At a status hearing on January 2, 2024, the Department noted Mother had not been consistent with drug testing. Additionally, Mother had been asked to leave Hannah House after she was caught "sneaking in her girlfriend, Stephanie . . . and getting high in the house." Mother stated that she would be moving into a new apartment later that week and that she had been put on a drug patch. The Department's counsel stated: "I think, Judge, we're really getting

to the spot where I think that [CPS] is going to need to be filing for potential termination and permanent legal custody given the length of time that these kids have been in care and the lack of very forward movement."

¶13 On February 7, 2024, the Department filed a petition for termination of parental rights and permanent legal custody, requesting the District Court find that good cause existed to deviate from ICWA placement preferences and to continue P.E.W.'s placement with the licensed foster family. The Department noted the Tribe's approval of termination for both Father and Mother's parental rights. The petition alleged that "[c]ontinuation of the parent-child legal relationship between [Mother] and the child will likely result in continued abuse or neglect," and that "it is no longer in the best interests of the child to continue to work towards reunification with [Mother]." The District Court set a termination hearing for February 27, 2024, but the hearing was continued until April 22, 2024, to allow the parties to participate in mediation. When the proposed mediator was unavailable, the parties agreed to move forward with the contested hearing.

¶14 On March 20, 2024, P.E.W. was moved to Shodair Children's Hospital due to escalating behavioral and mental health needs. P.E.W. was discharged from Shodair on March 29, 2024, and moved into another non-Native American foster home that was not a preferred placement under ICWA. She began seeing a therapist and doctor, receiving medication, and doing better. The foster parents said they were committed to helping P.E.W. succeed and, as part of a contingency plan, the foster parents secured a spot for

P.E.W. in Missoula's Sunshine Children's Home in the event P.E.W.'s mental health again declined.

¶15 At the termination hearing,[3] CPS Brunner testified that the window of success of Mother's Treatment Plan had closed, and that any additional time would likely produce no benefit: "[t]his case has been open since 2021 . . . I have not seen any changes in any of the parents and we're not closer to sobriety, we're not addressing her mental health." Adams again testified, offering: "[i]t is my—my opinion that if [P.E.W.] was returned to either of the parents at the present time, that she may slip back. . . . She has been through a horrific lifetime in her—her short years. And I would fear that it would be very detrimental if she was placed back with either one of them at this time." Between hearing days, Mother again started inpatient treatment but was discharged due to threatening behavior after which she was detained and placed on a psychiatric hold at the hospital. Mother appeared and offered testimony, first that she had been sober for approximately three weeks, and then during the final hearing day that she had been sober for sixty days. She stated she was living with a friend and, while she struggled to follow the rules of where she was living, she had not talked to Stephanie and was scheduled to again start inpatient treatment and see a new counselor.

¶16 The District Court issued its order terminating Mother's parental rights on November 1, 2024. It found that P.E.W. had been in foster care for "992 days (i.e. approximately 32.5 months) or approximately forty-six percent of her life," thus satisfying

---

[3] The termination hearing was conducted over three hearing days, on April 22, 2024, June 18, 2024, and July 16, 2024.

the presumption that P.E.W.'s best interests would be served by the termination of parental rights. *See* § 41-3-604(1), MCA (2021) ("If a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights."). Noting that Mother had reported some positive steps on the last day of the termination hearing, the District Court nonetheless reasoned that "[t]he time for [Mother] to progress on her treatment plan was during the approximate two years between court approval of her treatment plan on February 1, 2022[,] and the Department filing for termination of her parental rights on February 7, 2024." The District Court determined the Department made "appropriate and active, but ultimately unsuccessful, efforts to avoid the necessity of placing [P.E.W.] in a protective out-of-home placement and/or to make it possible to safely return [P.E.W] home and, pursuant to 25 U.S.C. § 1912(d), 'to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.'" The District Court found good cause existed to depart from ICWA's placement preferences based on clear and convincing evidence that: 1) "[P.E.W] has extraordinary physical, mental, or emotional needs, such as specialized treatment services, that are unavailable in the community where a preferred placement is;" and 2) "[n]o ICWA-preferred placement was located for [P.E.W.] despite the fact that the Department conducted a diligent search to find suitable placements for her that meet the ICWA preference criteria." Mother appeals.

**STANDARDS OF REVIEW**

¶17 This Court reviews a district court's decision to terminate a person's parental rights for abuse of discretion. *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586. The district court abuses its discretion if it terminates parental rights based on erroneous findings of fact, erroneous conclusions of law, or when it acts "arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re S.B.*, 2019 MT 279, ¶ 25, 398 Mont. 27, 459 P.3d 214 (citing *In re D.E.*, ¶ 21). "We review a district court's factual findings for clear error." *In re L.B.*, 2025 MT 6, ¶ 8, 420 Mont. 192, 562 P.3d 497. A factual finding is clearly erroneous if not supported by substantial evidence, if the lower court misapprehended the effect of the evidence, or if review of the record convinces this Court a mistake was made. *In re L.B.*, ¶ 8.

¶18 When ICWA applies, "we will uphold the district court's termination of parental rights if a reasonable fact-finder could conclude beyond a reasonable doubt that continued custody by the parent is likely to result in serious emotional or physical damage to the child." *In re S.B.*, ¶ 25 (citing *In re K.B.*, 2013 MT 133, ¶ 18, 370 Mont. 254, 301 P.3d 836). "Whether a district court has complied with ICWA's substantive and procedural requirements presents a question of law that we review for correctness." *In re S.B.*, ¶ 25 (citing *In re L.A.G.*, 2018 MT 255, ¶ 10, 393 Mont. 146, 429 P.3d 629). We will decline to reverse a district court's termination of parental rights unless it commits an error

11

resulting in a "significant impact upon the result." *In re H.T.*, 2015 MT 41, ¶ 10, 378 Mont. 206, 343 P.3d 159 (quoting *In re J.C.*, 2008 MT 127, ¶ 43, 343 Mont. 30, 183 P.3d 22).

**DISCUSSION**

¶19    *1. Did the District Court abuse its discretion by concluding the Department engaged in "active efforts," as required under ICWA, before terminating Mother's parental rights?*

¶20    "'Enacted in 1978 to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families, ICWA imposes heightened federal standards for the removal of Indian children from Indian families.'" *In re D.L.L.*, 2025 MT 98, ¶ 8, ___ Mont. ___, ___ P.3d ___ (quoting *In re L.H.*, 2021 MT 199, ¶ 11, 405 Mont. 173, 492 P.3d 1218 (citing 25 U.S.C. §§ 1902, 1911, 1912(d)-(f))).  At the heart of ICWA lies the core belief that preserving an Indian child's connection to their tribe is in their best interest.  *In re D.L.L.*, ¶ 8; *Mississippi Band of Choctaw Indians v. Holyfield, et al.*, 490 U.S. 30, 32 n.24, 109 S. Ct. 1597, 1609 (1989).

¶21    A district court may terminate parental rights when clear and convincing evidence demonstrates that the parent's child is an adjudicated YINC, the parent has not complied with an approved treatment plan, and the parent's conduct "rendering them unfit is unlikely to change within a reasonable time."  Section 41-3-609(1)(f), MCA.  Under ICWA, the Department must prove the criteria under § 41-3-609(1)(f) "beyond a reasonable doubt." *In re D.L.L.*, ¶ 10 (citing *In re K.L.N.*, 2021 MT 56, ¶ 19, 403 Mont. 342, 482 P.3d 650). "In addition to the statutory termination criteria, ICWA requires proof beyond a reasonable doubt, as established by a qualified expert witness's testimony, that 'the continued custody

of the child by the parent is likely to result in serious emotional or physical damage to the child.'" *In re D.L.L.*, ¶ 10 (citing *In re K.L.N.*, ¶ 19).

¶22   "Whether ICWA applies to a proceeding under Title 41, chapter 3, MCA, depends on whether the subject child is an 'Indian Child.'" *In re L.H.*, ¶ 11 (citing 25 U.S.C. §§ 1912(a), 1903 (defining "Indian child" as a person "under age eighteen" who is either "a member of an Indian tribe" or "eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe")). When the district court has reason to know that ICWA might apply to a case involving parental rights, the Department must immediately notify the Indian child's tribe of "the pending proceedings and of [the tribe's] right of intervention." *In re L.H.*, ¶ 11 (citing 25 U.S.C. § 1912(a) and *In re S.R.*, 2019 MT 47, ¶ 15, 394 Mont. 362, 436 P.3d 696).

¶23   Lastly, ICWA requires the Department demonstrate it has made "'active efforts' to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful." *In re D.L.L.*, ¶ 10 (citing *In re B.Y.*, 2018 MT 309, ¶¶ 8-9, 393 Mont. 530, 432 P.3d 129; 25 U.S.C. § 1912(d)). We have recognized "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family . . . in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe." *In re D.L.L.*, ¶ 10 (collecting citations further describing "active efforts" as defined by 25 C.F.R. § 23.2).[4]

---

[4] Montana adopted the definition of "active efforts" as provided by 25 C.F.R. § 23.2 in the Montana Indian Child Welfare Act. Section 41-3-1319, MCA.

¶24 It is undisputed that P.E.W. is an Indian child for purposes of ICWA because Father was an enrolled member of the Tribe. Mother contends the Department failed to make active efforts to reunify her with P.E.W., as required by ICWA.

¶25 CPS workers Brunner and Saunders testified to the measures the Department undertook to assist Mother in completing her Treatment Plan. The Department identified community resources, including various treatment homes, facilitated regular visitations for Mother with P.E.W., provided transportation, and assisted financially by purchasing food, clothes, and bus passes. CPS workers personally helped Mother do her laundry, delivered her mail and government assistance, and transported her from homeless shelters to treatment centers and court dates. This support continued for the period of two years that reunification of Mother and P.E.W. was the primary goal of the Department. The Tribe was notified of the proceedings early on, but took the position that termination was appropriate. CPS workers interviewed Mother and Father and contacted all potential extended family members searching for an ICWA-compliant placement for P.E.W. Reports of abuse from the grandmother's boyfriend necessitated the removal of P.E.W. and her half-brother from a place of familiarity and, despite trying to keep the siblings together, P.E.W. did not take well to the concurrent placement. The Department documented P.E.W.'s mental health decline and responded with inpatient and outpatient treatment for P.E.W. when her behaviors became too problematic for experienced foster families. The District Court found the Department's efforts were "exemplary" and "more than sufficient

14

for active efforts" to assist Mother in obtaining return of her children. All the while, Mother left a trail of unsuccessful attempts at treatment, employment, and relationships.

¶26 "While the Department must make 'active' reunification efforts under ICWA, a parent also has 'an obligation to avail herself of services arranged or referred by the Department and engage with the Department to successfully complete her treatment plan.'" *In re D.L.L.*, ¶ 11 (quoting *In re R.J.F.*, 2019 MT 113, ¶ 38, 395 Mont. 454, 443 P.3d 387; citing *In re D.A.*, 2008 MT 247, ¶ 22, 344 Mont. 513, 189 P.3d 631). Although Mother utilized services referred to her by the Department, she was frequently dismissed from the same services due to her chemical dependency, anger, or failure to comply with rules. She did not complete her Treatment Plan because she could not maintain housing, sobriety, or a job long enough to demonstrate the ability to care and support P.E.W.—a child needing a high level of care—in a healthy and stable environment. Adams, the ICWA expert, testified that returning P.E.W. into Mother's custody would prove to be detrimental to the child's well-being, and the Tribe did not intervene. P.E.W. had spent an extensive period of her life in foster care, giving rise to the statutory presumption that the best interests of the child would "be served by termination of parental rights." Section 41-3-604(1), MCA.

¶27 In addition to applying the presumption, the District Court cited circumstantial and direct evidence to support findings that Mother's continued custody of P.E.W. would likely result in serious emotional or physical damage to the child. The District Court correctly applied the relevant ICWA provisions, engaged the Tribe, and assessed whether the

15

Department undertook active efforts to reunify P.E.W.'s family. *See In re D.L.L.*, ¶ 18 (holding the district court "correctly concluded the Department made 'active efforts' under ICWA when placing J.T.L. and D.L.L. in foster care" when the tribe had "no kinship or Native American foster placements available and the parents' recommended kinship placements were not qualified"). We conclude the District Court did not abuse its discretion in determining ICWA was satisfied and that termination of Mother's parental rights was in the best interests of P.E.W.

¶28    *2. Did the District Court err by approving on the basis of good cause a deviation from ICWA placement preferences for P.E.W.?*

¶29    "ICWA provides that, when placing Indian children, 'preference shall be given, in the absence of good cause to the contrary,' to members of the child's extended family, members of the child's tribe, or other Indian families, among others." *In re D.L.L.*, ¶ 13 (quoting 25 U.S.C. § 1915(a)-(b)). Following the passage of ICWA, the Bureau of Indian Affairs (BIA) announced guidelines to assist state courts in interpreting the federal regulations. 44 Fed. Reg. 67,584 (Nov. 26, 1979). These guidelines are updated. 81 Fed. Reg. 38,864 (June 14, 2016) (codified at 25 C.F.R. § 23); U.S. Dep't of Interior, Bureau of Indian Affairs, *Guidelines for Implementing the Indian Child Welfare Act* (Dec. 2, 2016), available at https://perma.cc/D2H9-CBG5 (hereinafter, BIA Guidelines). "This Court has determined these guidelines are persuasive and that we apply them when interpreting ICWA." *In re M.B.*, 2009 MT 97, ¶ 16, 350 Mont. 76, 204 P.3d 1242 (citing *In re C.H.*, 2000 MT 64, ¶ 12, 299 Mont. 62, 997 P.2d 776). According to the BIA Guidelines, the Department should: "conduct a diligent search for placements that comply with [ICWA]

placement preferences." BIA Guidelines, at 58. A diligent search should also involve the Department asking the parents for information, contacting all known extended family, contacting all tribes with which the child is affiliated, conducting diligent follow-ups with all potential placements, and contacting institutions for children approved or operated by Indian tribes if other preferred placements are not available. BIA Guidelines, at 58-59.

¶30 A district court may depart from ICWA's placement preferences upon a demonstration of good cause. 25 U.S.C. § 1915(a). "A court's determination of good cause to depart from the placement preferences must be made on the record or in writing" and should be based on certain considerations, such as "[t]he extraordinary physical, mental, or emotional needs of the Indian child, such as specialized treatment services that may be unavailable in the community where families who meet the placement preferences live" or "[t]he unavailability of a suitable placement after a determination by the court that a diligent search was conducted to find suitable placements meeting the preference criteria, but none has been located." 25 C.F.R. § 23.132(c). The BIA Guidelines indicate that a state court has "the ultimate authority" to decide whether good cause exists. BIA Guidelines, at 61. "The rule thereby retains discretion for courts and agencies to consider any unique needs of a particular Indian child in making a good cause determination." BIA Guidelines, at 61.

¶31 The District Court recognized that placing P.E.W. in licensed foster care homes with non-Native American families was not an ICWA preferred placement. Seeking to best address P.E.W.'s significant behavioral and emotional needs, the District Court approved

17

multiple non-Native American foster placements for P.E.W. that provided access to needed services, including therapy, preschool, and visitation with Mother and B.J.B. P.E.W.'s placement with her paternal grandmother did not provide satisfactory support and safety for P.E.W. The Department interviewed both Mother and Father and conducted follow-up interviews with identified kin who were either unable or unwilling to provide P.E.W. with permanency. The Tribe did not indicate that it was aware of additional kinship placements or foster homes, and it did not otherwise intervene to secure placement for P.E.W. The foster family that received P.E.W. upon her discharge from Shodair was willing to have P.E.W. as the only child in their home, work with P.E.W.'s concerns daily, and secure alternative resources to adapt to P.E.W.'s escalating behavioral issues. Importantly, as the District Court noted, Mother never directly challenged the existence of good cause to deviate from ICWA's preferred placement guidelines.

¶32 We conclude the District Court did not err by determining that good cause existed to deviate from ICWA's placement preferences in providing P.E.W. with a permanency option in a non-Native American foster home.

¶33 Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M BIDEGARAY
/S/ INGRID GUSTAFSON

18