DA 25-0047

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 178

IN THE MATTER OF:

S.W. and D.W.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. ADN-24-107 and
ADN-24-108
Honorable David J. Grubich, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Kelli S. Sather, Kelli S. Sather, PLLC, Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Mardell Ployhar,
Assistant Attorney General, Helena, Montana

      Joshua A. Racki, Cascade County Attorney, Valerie Winfield, Deputy
County Attorney, Great Falls, Montana

            Submitted on Briefs:  July 23, 2025

            Decided:  August 12, 2025

Filed:

                            _____
                                        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 A.W. (Father) appeals from the December 24, 2024, Order of the Eighth Judicial District Court, Cascade County, terminating his parental rights to twin boys, S.W. and D.W. Father asserts the District Court erred when it relied on prior termination proceedings involving the twins' older siblings to conclude D.W. and S.W. were subjected to chronic, severe neglect. Father further argues his constitutional due process rights were violated because the Department of Public Health and Human Services, Child and Family Services Division (the Department) did not make reasonable efforts to reunify him with S.W. and D.W. during the interim between the Department's filing of the Petition and the termination hearing. The State counters that Father's due process rights were not violated because he had notice of the Department's request for no reasonable efforts, and the District Court did not abuse its discretion by considering the abuse of S.W.'s and D.W.'s older siblings in its evaluation of the problems that persisted within the children's home.

¶2 We consider:

*Did the District Court err when it terminated Father's parental rights?*

¶3 We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4 Father and birth mother, M.W. (Mother), resided in Great Falls, Montana, and had a lengthy history of involvement with the Department. Between 2017 and 2023, the Department removed Mother's and Father's oldest two children three separate times due to reports of domestic violence, chemical dependency, unsuitable living conditions, abuse, and neglect. Both Father's and Mother's parental rights to the two older children were

2

eventually terminated.[1]  In late 2023, as termination proceedings were taking place for their oldest children, Father and Mother temporarily moved to Washington, where Mother gave birth to the twin boys at issue in this case, S.W. and D.W.  At the time of the twins' birth, Father and Mother were homeless.  At least one of the twins had an extended hospital stay because he was experiencing drug withdrawals.  Washington Child and Family Services removed S.W. and D.W. from Mother's and Father's care but closed their case fifteen days later, after helping Father and Mother obtain housing in a family shelter.  When S.W. and D.W. were four to six months old, sometime in the spring of 2024, Father and Mother moved back to Great Falls to reside at the same house in which they had been living before relocating to Washington.

¶5     On July 29, 2024, the Department received a report describing unsanitary living conditions in the home, excessive yelling, and the sound of infants crying.  The Department's Child Protective Services (CPS) worker, Dawn Wood (Wood) responded to the residence on July 30, 2024.  Wood heard people inside, but no one answered the door. Law enforcement went to the home on July 31, 2024, accompanied by Wood, to serve a search warrant.  They gained entry to the home by breaking down the door.  Law enforcement located Mother and Father in the home, as well as a Level 2 sex offender who

---

[1] The first removal of Father's and Mother's oldest two children was under ADN-17-078.  Father and Mother completed their treatment plans and regained custody of the children in February of 2019.  The second removal was in October of 2021 under BDN-21-209 and -210.  Again, Father and Mother completed treatment plans and regained custody in June of 2022.  The third removal occurred in January of 2023 in DN-7-23-010 and -011, wherein Father's and Mother's parental rights to their two older children were involuntarily terminated on March 22, 2024, without treatment plans.

3

acted as a caretaker for the twins. Mother's body was covered in bruises. Wood noted that S.W. and D.W. were sleeping in playpens near the door. One playpen had a broken piece of metal sticking out, the twins' diapers were over-filled and seeping, one had diaper rash, and they did not have clean or appropriately sized clothing available. The windows in the home were boarded up, glass was scattered on the ground, laundry had mildewed, Suboxone wrappers were on the floor with crushed pills, and an electrical cord for an air conditioner was being used as a clothesline above the twins' playpens. Both Mother and Father appeared intoxicated and were arrested for obstructing law enforcement. Father said the twins had not received any medical care in Montana since being discharged from the hospital in Washington. Wood secured the twins in car seats and observed minor cuts on both D.W. and S.W., which she attributed to their overgrown, sharp, and broken fingernails. The Department later noted delays in the eight-month-old twins, as they appeared unable to eat applesauce and struggled sitting up on their own.

¶6      On August 2, 2024, the Department filed a Petition for Emergency Protective Services, Determination that Reasonable Efforts are Not Required, Termination of Parental Rights, and Permanent Legal Custody (Petition) for D.W. and S.W, along with a supporting Affidavit of Wood. In the Affidavit, Wood stated "CPS was unable to make reasonable efforts to prevent removal as both parents were arrested for child endangerment. Parents do not recognize existing safety issues and have been resistant to [D]epartment's prior interventions." The District Court issued an "Order to Show Cause, Granting Emergency Protective Services, Notice of Show Cause and Termination Hearing." A hearing for emergency protective services was held August 7, 2024. Neither Mother nor Father

4

contested probable cause for the children's removal. An adjudication and termination hearing was set for August 21, 2024, but was continued upon Mother's request until September 25, 2024. Father did not object to the continuance. The Department filed a Motion to Appoint Attorney-Guardian *Ad Litem* (GAL) for the Youths on September 20, 2024, and GAL Matthew Murphy (Murphy) was appointed the same day. On September 24, 2024, Murphy filed the GAL Report and Recommendation, which recommended that the Court find no reasonable efforts needed to be provided due to the Department's previous involvement with Mother and Father being based on the same or substantially similar reasons as what led to the twins' removal from their care.

¶7 All interested parties were present for the September 25 adjudication and termination hearing. However, due to scheduling conflicts with the District Court's calendar, the hearing did not proceed. On September 30, 2024, the District Court issued an Order stating the termination hearing would "resume" on December 13, 2024. At that time, Mother and Father were present and indicated they had plans to begin inpatient treatment and achieve sobriety. Wood addressed reasonable efforts in the present case in the following exchange:

> Q. And in this case, you filed for termination and removal; right?
> A. Yes. No reasonable efforts.
> Q. And so, you have not made any reasonable efforts on behalf of these two children to reunify them with their family.
> A. I absolutely did. I provided the parents with numerous resources. I mean, technically, I was not required to provide them assistance, but of course I still did. I still tried to get them help, just as I did in the last case. I set them up with services. I wasn't required to, but I still believed that they were offered because I think everybody should be.
> Q. In this case you've offered them—
> A. Yes.

5

Q. –visitation.
A. Yes.
Q. Have you given them information on services to reach out to?
A. Yes.
Q. Have you done anything other than those two things?
A. I don't think so.

¶8 Speaking to Mother and Father, the District Court said:

> The problem is, you went right back to the same place, the same residence that was found in deplorable conditions in the previous case. . . . It was a home that was not acceptable to the Department or the Court. . . . So, I don't think that the Court can ignore when it's making a determination on whether or not there is chronic severe neglect, can't ignore that . . . this is an ongoing problem that has repeatedly drawn the attention of the Department that has repeatedly resulted in the removal of your children. It's chronic as to the children because it's chronic as to you.

The District Court then adjudicated both D.W. and S.W. as "Youths in Need of Care" under § 41-3-102(36), MCA, and proceeded to order termination of Father's and Mother's parental rights. In its December 24th Order, the District Court found clear and convincing evidence supported termination of Mother's and Father's legal relationships with D.W. and S.W. because "the birth parents have subjected the [twins] to aggravated circumstances, including but not limited to chronic, severe neglect and prior terminations." The District Court further concluded "[t]he conduct or condition making the birth parents unfit is unlikely to change within a reasonable time, due to their inability to care for the physical, mental, and emotional needs of [the twins] outside of Department intervention within a reasonable time," and that "[i]t is in the best interests of [S.W.] and [D.W.] to grant permanent legal custody to the Department." The District Court determined that a treatment plan was "not statutorily required pursuant to § 41-3-609(4), MCA" and that "the Department need not provide any further efforts to preserve the parent-child relationship

6

between the [twins] and the birth parents; or to reunify the [twins] with the birth parents." A permanency hearing was held on January 22, 2025; Mother and Father were not present. The Court approved the twins' permanency with the Department.

¶9     Father appeals.[2]

## STANDARDS OF REVIEW

¶10     This Court reviews a district court's decision to terminate a person's parental rights for abuse of discretion. *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586. A district court abuses its discretion if it terminates parental rights based on erroneous findings of fact, erroneous conclusions of law, or when it acts "arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re S.B.*, 2019 MT 279, ¶ 25, 398 Mont. 27, 459 P.3d 214 (citing *In re D.E.*, ¶ 21).

¶11     The Department must prove by clear and convincing evidence that the statutory criteria for termination have been met. *In re C.S.*, 2020 MT 127, ¶ 9, 400 Mont. 115, 464 P.3d 66. For these cases, "clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing." *In re R.J.F.*, 2019 MT 113, ¶ 20, 395 Mont. 454, 443 P.3d 387.

---

[2] Mother appealed the termination of her parental rights in DA 25-0045. On March 19, 2025, this Court issued an Order consolidating both appeals under DA 25-0047. On May 12, 2025, Mother's counsel filed a Motion to Withdraw as Counsel of Record, claiming she was "unable to find any non-frivolous issues to raise on appeal." Mother did not respond to counsel's motion or participate in appellate briefing. The status of Mother's appeal will be addressed in a separate Order.

¶12 We review a district court's factual findings for clear error. *In re P.E.W.*, 2025 MT 114, ¶ 18, 422 Mont. 193, 569 P.3d 613. "A factual finding is clearly erroneous if not supported by substantial evidence, if the lower court misapprehended the effect of the evidence, or if review of the record convinces this Court a mistake was made." *In re P.E.W.*, ¶ 18. Conclusions of law are reviewed de novo for correctness. *In re B.J.B.*, 2025 MT 116, ¶ 5, 422 Mont. 224, 569 P.3d 584 (citing *In re M.V.R.*, 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058).

## DISCUSSION

¶13 Pursuant to § 41-3-427(1)(b), MCA, a petition for immediate protection and emergency protective services must allege facts establishing probable cause that a child is abused or neglected or is in danger of being abused or neglected. "An abuse and neglect petition may request relief including emergency protective services, temporary investigative authority, temporary legal custody, termination of parental rights, appointment of a guardian, or a determination that reunification services are not required." *In re L.N.*, 2014 MT 187, ¶ 15, 375 Mont. 480, 329 P.3d 598 (citing § 41-3-422(1)(a), MCA). The court must conduct a show cause hearing within 20 days of the filing of an initial petition, "unless the parties agree otherwise or an extension is granted by the court." *In re L.N.*, ¶ 15 (citing § 41-3-432(1)(a), MCA). "At the show cause hearing, if parents stipulate or do not sufficiently refute the allegations establishing probable cause that the child is abused or neglected or in danger of abuse or neglect, the court will continue [emergency protective services] and at least grant the Department temporary investigative authority for a period of up to 90 days." *In re C.B.*, 2019 MT 294, ¶ 19, 398 Mont. 176,

8

454 P.3d 1195 (citing §§ 41-3-432(2), -433, MCA). Although statute requires a show cause hearing within 20 days, "the statute also allows for the determination of issues in a show cause hearing to go beyond that time limit and occur in later hearings pursuant to such a finding by the court." *In re C.B.*, ¶ 19.

¶14 Upon hearing the petition, a district court may designate a child as a "Youth in need of care" (YINC) if the court determines by a preponderance of the evidence that the child has been "abused, neglected, or abandoned." Sections 41-3-437(2), -102(36), MCA. A court may terminate parental rights "upon a finding established by clear and convincing evidence" that "the parent has subjected a child to any of the circumstances listed in §§ 41-3-432(2)(a) through (2)(e)." Section 41-3-609(1)(d), MCA. Pursuant to § 41-3-423(2), MCA, the Department may "make a request for a determination that preservation or reunification services need not be provided," and the District Court may enter such a finding "if the court finds that the parent has: (a) subjected a child to aggravated circumstances, including but not limited to abandonment, torture, chronic abuse, or sexual abuse or chronic, severe neglect of a child" or "(e) had parental rights to the child's sibling or other child of the parent involuntarily terminated and the circumstances related to the termination of parental rights are relevant to the parent's ability to adequately care for the child at issue." Receipt of reunification services is thus circumscribed by the paramount concern for the child's health and safety. Section 41-3-423(1)(c), MCA.

9

¶15    *Did the District Court err when it terminated Father's parental rights?*

**A. The District Court did not abuse its discretion when it based termination of Father's parental rights on prior terminations and chronic, severe neglect.**

¶16    At the December 13th hearing, the District Court made an oral ruling terminating Father's parental rights to D.W. and S.W. based on the District Court's conclusion that he had subjected the twins to two of the circumstances listed in § 41-3-423(2), MCA:  1) that Father chronically and severely neglected the children under § 41-3-423(2)(a), MCA, and 2) that Father had his parental rights to other children involuntarily terminated under circumstances relevant to his ability to adequately care for the twins under § 41-3-423(2)(e), MCA.    Likewise, in its written Order, the District Court concluded reunification efforts were not required based on "aggravated circumstances, including but not limited to chronic, severe neglect *and* prior terminations."[3] (Emphasis added.)

¶17    We conclude that substantial evidence supports the District Court's determination that circumstances relevant to Father's inability to care for D.W. and S.W. persisted from the earlier termination of his parental rights, under § 41-3-423(2)(e), MCA.  It is undisputed that Father had his parental rights to his two eldest children involuntarily terminated.  The District Court was free to take judicial notice of Father's prior terminations and the underlying facts of each case.  *See* M. R. Evid. 202(b)(6) (a court may take judicial notice of "[r]ecords of any court of this state or of any court of record of the United States or any

---

[3] The District Court's written Order cited only § 41-3-423(2)(a), MCA, and not § 41-3-423(2)(e), MCA, but the findings of fact and conclusions of law contained therein, combined with the District Court's discussion during the adjudication hearing, make clear that the District Court premised the termination of Father's parental rights on both statutory grounds.

court of record of any state of the United States"). The Department's pleading extensively contended that the termination of Father's rights was directly related to the same issues that led to the eventual removal of the twins, including that Father struggled with chemical dependency, the home was unsuitable for children, the children did not receive proper care to the point of neglect, and there were credible reports of domestic violence when the children were present. The District Court heard that, when law enforcement arrived on July 31, 2024, Mother appeared bruised and battered, Father appeared intoxicated, glass shards and drugs were scattered about, and the twins were left with soiled diapers under an electrical cord that doubled as a makeshift clothesline. Father admitted that he continued to struggle with sobriety at the time of the adjudication and termination hearing. Clearly, the issues that prevented Father from adequately caring for S.W. and D.W. were related to, or, perhaps more accurately, a continuation of, the same issues that led to the involuntary termination of his parental rights for his older children the year prior.

¶18    Father also contests the termination of his parental rights on the separate ground of chronic, severe neglect. This Court has previously defined "chronic" as "marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness." *In re M.N.*, 2011 MT 245, ¶ 27, 362 Mont. 186, 261 P.3d 1047 (quoting *Webster's Third New Int'l Dictionary*, 402 (1961)). This does not mean infants cannot be subjected to "chronic" abuse simply because they have been in their parents' care for a relatively short amount of time. *See In re M.N.*, ¶ 29 ("[c]hildren need not be left to 'twist in the wind' before neglect may be found chronic and severe"). "Discrete instances of neglect, when viewed within a consistent pattern of similar behavior, provide a clear basis

11

by which a district court can find 'chronic, severe neglect.'" *In re M.N.*, ¶ 30. The record provides substantial evidence that both S.W. and D.W. were subjected to chronic, severe abuse. From birth, the twins suffered from exposure to drugs. They did not receive customary pediatric care after being discharged from the hospital and, instead, were moved from a homeless shelter into a residence in another state that was "found in deplorable conditions." S.W. and D.W. cried as their parents screamed at one another—enough to prompt others to alert law enforcement. Adults in the home, including a Level 2 sex offender, allowed the twins to sleep under electrical wires, in a broken playpen, with dirty diapers, burns from diaper rash, and in clothes that did not fit. Over the eight months of their lives, S.W. and D.W. had not been properly cared for, and they exhibited signs of developmental delay as a result. As the District Court noted, severe neglect had become a chronic issue in Father's home that had "repeatedly drawn the attention of the Department" and had "repeatedly resulted in the removal of [his] children."

¶19　"Where a district court relies on more than one statutory basis in terminating parental rights, any one basis, if correctly relied upon, is sufficient to support termination." *In re S.T.*, 2008 MT 19, ¶ 15, 341 Mont. 176, 176 P.3d 1054 (citing *In re M.J.W.*, 1998 MT 142, ¶ 18, 289 Mont. 232, 961 P.2d 105). Here, the Department provided substantial evidence to support two statutory bases for terminating Father's parental rights. *See* §§ 41-3-423(2)(a), -423(2)(e), MCA. The District Court weighed the evidence and correctly determined both statutory provisions were applicable to S.W. and D.W. Therefore, the District Court did not abuse its discretion in terminating Father's parental

rights to D.W. and S.W. based upon multiple grounds, each of which, on its own, would have been sufficient to support termination.

**B. Father's due process rights were not violated when the Department did not provide reunification efforts after filing the Petition and before the termination hearing.**

¶20 Generally, before petitioning for termination of parental rights, the Department must make "reasonable efforts" to provide reunification services to the family. Section 41-3-423, MCA. Father argues the Department made no reasonable efforts to provide reunification services between when the Petition was filed on August 2, 2024, and the termination hearing on December 13, 2024, in violation of his constitutional rights. Our prior holdings lead us to conclude the Department was statutorily exempted from making reasonable efforts for Father after it requested the District Court to make a determination that such efforts were unnecessary.

¶21 The right to parent is a fundamental liberty interest; therefore, "[t]ermination procedures must comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *In re C.B.*, 2019 MT 294, ¶¶ 15, 18, 398 Mont. 176, 454 P.3d 1195 (internal citations omitted). The two components of due process are: 1) notice and 2) an opportunity to be heard "at a meaningful time and in a meaningful manner." *In re Marriage of Stevens*, 2011 MT 124, ¶ 18, 360 Mont. 494, 255 P.3d 154 (citations omitted). Notice must be "reasonably calculated to inform interested parties of the action and afford them an opportunity to present objections." *Dorwart v. Caraway*, 1998 MT 191, ¶ 93, 290 Mont. 196, 966 P.2d 1121. Overall, "when the State seeks to terminate a parent's interest in the care and custody of his or her child, the guiding due

process principle requires that the parent not be placed at an unfair disadvantage during the termination proceedings." *In re C.B.*, ¶ 18 (citing *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, 87 P.3d 408). To establish a due process claim, a parent "must demonstrate how the outcome would have been different had the alleged due process violation not occurred." *In re C.B.*, ¶ 18 (citing *In re B.J.J.*, 2019 MT 129, ¶ 13, 396 Mont. 108, 443 P.3d 488).

¶22   In *In re C.B.*, a mother's parental rights were involuntarily terminated under § 41-3-423(2)(e), MCA, and she appealed, claiming her due process rights had been violated when the Department "failed to provide reasonable efforts to avoid removing [her child] and failed to provide any efforts for four months thereafter" prior to the adjudication hearing, and when the hearing "was held outside the statutory timeframe." *In re C.B.*, ¶¶ 19, 28. We noted the mother "had notice of the Department's intent to seek termination of her parental rights and that reunification services need not be provided based on service of the Department's petition," and that the mother was afforded a meaningful opportunity to be heard when she attended the termination hearing. *In re C.B.*, ¶ 30. This Court affirmed the district court's holding that the Department did not need to provide reunification services to the mother, reasoning that § 41-3-423(2), MCA, "exempts the Department from providing these services" and "does not provide a timeline for a hearing on a 'reasonable efforts' motion or a decision by the court." *In re C.B.*, ¶ 29. We stated: "the Department was exempt from providing 'reasonable efforts' at reunification because there was clear and convincing evidence that Mother continued to abuse drugs such that

her past involuntary terminations were relevant to her ability to adequately care for [her child]." *In re C.B.*, ¶ 30.

¶23 This case is very similar to *In re C.B.* Father was given notice of the Department's intent to seek termination of his parental rights and that the Department did not intend to provide Father with a treatment plan or provide reunification services from the Department's Petition. One could argue Father received even more notice than the mother in *In re C.B.* because Murphy's GAL Report recommended the Court find no reasonable efforts needed to be provided. Additionally, Father was afforded a meaningful opportunity to be heard at not one, but two hearings. While the continuation of the termination hearing was certainly unfortunate, it did not violate Father's due process rights because he was present at the show cause hearing, which occurred within 20 days of the Petition's filing, he did not contest probable cause for the twins' removal, and he failed to object to at least one continuance of the termination hearing. *See In re C.B.*, ¶ 19 (the statute "allows for the determination of issues in a show cause hearing to go beyond that time limit and occur in later hearings"). For these reasons, we determine Father was provided with sufficient notice and an opportunity to be heard.

¶24 Further, Wood testified to the efforts she personally made in attempting to assist Father, including offering him visitation with the twins and providing him with information on services. As Wood correctly noted, "technically, [she] was not required to provide [Father] with assistance." While the Department was under no obligation to provide reunification services after it petitioned the District Court to determine whether the services

15

were necessary, Father was afforded the opportunity provided by Wood's extra effort and received fundamentally fair procedures leading up to the termination hearing.

¶25 Father was present when the District Court adjudicated the twins as Youths in Need of Care and made specific factual findings as to his inability to change within a reasonable time, eventually concluding termination of Father's parental rights was appropriate under two subsections of § 41-3-423(2), MCA, and in the "best interests" of S.W. and D.W. The District Court orally imposed its ruling and set out a written Order to the same effect, and Father exercised his right to appeal. Before this Court, Father has not demonstrated how the outcome of these proceedings would have been any different had the Department provided additional reunification services prior to the termination hearing. Therefore, we conclude that reasonable efforts for reunification services were not required, and the District Court did not violate Father's right to due process.

¶26 Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ KATHERINE M BIDEGARAY

Justice Katherine Bidegaray, concurring.

¶27 I concur in the Court's decision to affirm the termination of Father's parental rights to S.W. and D.W. The District Court's findings are supported by substantial evidence and

16

reflect a conscientious application of the statutory standards in §§ 41-3-423 and -609, MCA. I agree that clear and convincing evidence supports termination under § 41-3-609(1)(d), MCA, based on both prior involuntary terminations relevant to current parenting ability, § 41-3-423(2)(e), MCA, and chronic, severe neglect, § 41-3-423(2)(a), MCA. I write separately to clarify two points for the guidance of courts and the Department in future cases.

**1. The Department's Pre-Petition Obligation to Make Reasonable Efforts**

¶28 The Majority correctly applies *In re C.B.*, 2019 MT 294, 398 Mont. 176, 454 P.3d 1195, to hold that, once the Department files a petition for a no-reasonable-efforts finding under § 41-3-423(2), MCA, and clear and convincing evidence supports a statutory exception, the Department has no obligation to provide reunification services while the petition is pending. I join that holding without reservation.

¶29 Section 41-3-423(1), MCA, nevertheless imposes a separate, pre-petition obligation on the Department to make "reasonable efforts to prevent the necessity of removal" and to "reunify families that have been separated by the state." This duty continues to apply even when the Department intends to seek a no-reasonable-efforts determination. The statute directs the Department to conduct a comprehensive family assessment, identify appropriate services, actively assist parents in accessing those services, and explore safe placement options with extended family members.

¶30 In this case, the Department entered the home and removed the twins on July 31, 2024, because of immediate and serious safety threats. The record shows little evidence that the Department made pre-petition efforts beyond the removal itself. The exigency

17

likely excused more extensive preventive services, but courts should still examine whether the Department could have taken reasonable preventive steps before removal without endangering the children. Even when a no-reasonable-efforts petition is imminent, the statute requires that analysis.

### 2. The Standard for "Chronic, Severe Neglect"

¶31    I agree with the Majority that the record demonstrates chronic, severe neglect. The unsafe home environment, the lack of basic care, and the twins' developmental delays establish neglect that is both severe and part of a long-standing pattern. Section 41-3-423(2)(a), MCA, lists "chronic, severe neglect" alongside abandonment, torture, chronic abuse, and sexual abuse as "aggravated circumstances." Courts must measure the severity of neglect in relation to those other grave conditions. While a single lapse in care does not meet the threshold, a court need not wait until a child suffers irreparable harm before finding chronic, severe neglect. *In re M.N.*, 2011 MT 245, ¶ 29, 362 Mont. 186, 261 P.3d 1047.

¶32    In this case, the neglect of the twins did not occur in isolation. It continued in the same unsafe conditions—substance abuse, domestic violence, and hazardous housing— that led to repeated removals and the termination of parental rights to their older siblings. This continuity satisfies the "long duration" element of chronic neglect and preserves the Legislature's intent to reserve the term for serious and persistent harm.

**3. Conclusion**

¶33    The record meets both § 41-3-423(2)(a) and (e), MCA.  The District Court acted within its discretion when it terminated Father's parental rights.  I concur in the Court's opinion and judgment, with the clarifications stated above.

/S/ KATHERINE M BIDEGARAY